PARIENTE, J.
 

 This case, pending in the federal court, involves interpretation of Florida law on third-party bad-faith causes of action in insurance cases. We have jurisdiction because the Eleventh Circuit Court of Appeals certified two questions,
 
 [1]
 
 which are
 
 *895
 
 “determinative of the cause and fpr which there is no controlling precedent.” Art. V, § 3(b)(6), Fla. Const.
 

 Although in this case the Eleventh Circuit has asked us broad questions regarding common law bad-faith cause of actions under Florida law, we have determined that, based on the unique circumstances of this case, the answer to whether the appellant, Pamela Perera (“Perera”), has an actionable bad-faith case against appellee, United States Fidelity and Guaranty Company (“USF & G”), allows for a more narrow framing of the question:
 

 MAY A CAUSE OF ACTION FOR THIRD-PARTY BAD FAITH AGAINST AN INDEMNITY INSURER BE MAINTAINED WHEN THE INSURER’S ACTIONS WERE NOT A CAUSE OF THE DAMAGES TO THE INSURED OR WHEN THE INSURER’S ACTIONS NEVER RESULTED IN EXPOSURE TO LIABILITY IN EXCESS OF THE POLICY LIMITS OF THE INSURED’S POLICIES?
 

 The jury in this case found that USF
 
 &
 
 G acted in bad faith and that finding is not controverted. The issue raised by the rephrased certified question is whether the insured sustained recoverable damages as the result of the bad faith. We answer the rephrased certified question in the negative because, based on the facts of this case, the insurer’s actions neither caused the damages claimed by the insured nor resulted in exposure of the insured to liability in excess of the policy limits of the insureds’ polices.
 

 FACTS AND PROCEDURAL HISTORY
 
 [2]
 

 Perera’s husband, Mitchell Perera, an employee of Estes Express Lines Corporation (“Estes”), was crushed to death by a piece of equipment during the course of his employment. As the personal representative of his estate, Perera filed a wrongful death suit against Estes and specified named employees of Estes (“employees”) in Hillsborough County Circuit Court (“state trial court”).
 

 At the time of Mitchell Perera’s death, Estes maintained three insurance policies: a commercial liability policy (insuring only the employees of Estes) issued by Cigna Property and Casualty Insurance Company (“Cigna”) with a limit of $1 million, subject to a $500,000 deductible; an excess worker’s compensation employer’s liability policy (insuring only Estes) issued by USF
 
 &
 
 G with a limit of $1 million after Estes’ self-insured retention of $350,000; and an umbrella excess liability policy (insuring both Estes and its employees) issued by the Chubb Group of Insurance Companies (“Chubb”) with a limit of $25 million. All three policies required Estes to provide its own defense.
 

 After learning of Perera’s lawsuit, USF & G denied coverage, asserting that the intentional acts exclusion contained in the USF & G policy precluded coverage of Perera’s claim against Estes.
 
 [3]
 
 In March 2001, Perera formally demanded $12 mil
 
 *896
 
 lion to settle the case. About a week later, Perera, Estes, and the three insurance companies met to mediate the case. During mediation, when USF & G insisted on its coverage defense and refused to tender its policy limits of $1 million, USF & G was asked to leave the mediation. At mediation, Cigna offered $500,000 (representing the policy limits of $1 million minus Estes’ $500,000 deductible), Estes offered $750,000, and Chubb offered $1.25 million. However, the last demand from Perera was $8 million, and the case failed to settle at mediation.
 

 In the months that followed, Chubb took an active role in handling the settlement negotiations. According to trial testimony and correspondence written by Chubb, after mediation Perera had demanded $8 million in total to settle the case and Chubb offered $3.5 million. There is some indication that USF & G was willing to participate in a settlement by contributing $100,000 but that it continued to rely on its coverage defense in declining to offer its policy limits. Then, in early August 2001, Perera demanded $7 million in total and Chubb offered $4.25 million for a global settlement to settle the entire case, provided that the right to seek indemnity, contribution, or reimbursement from USF & G be preserved.
 

 In late August 2001, Perera, Estes, and its employees entered into a “Stipulation to Settle” for $10 million.
 
 [4]
 
 The stipulation provided that Estes and its employees would pay $5 million and provide a written waiver of the workers’ compensation lien. Although not stated in the stipulation, the negotiated settlement provided that the $5 million would be paid as follows: $750,000 from Estes,
 
 [5]
 
 $500,000 from Cigna, and $3.75 million from Chubb. The remaining $5 million was to be sought in a lawsuit against USF & G, which Estes agreed to either bring or assign to Perera. Perera agreed in the settlement not to execute or record the judgment pending resolution of the lawsuit against USF & G. Perera further agreed that she would issue a satisfaction of judgment at the conclusion of the lawsuit, even if the suit did not result in the recovery of any additional proceeds.
 

 In accordance with the provisions in the stipulation, the state trial court held a limited evidentiary hearing for the purpose of determining that the stipulation was entered “in good faith” and that the amount of the settlement was reasonable. After finding that the settlement was in good faith and that the amount of the settlement was reasonable, the state trial court approved the stipulation. Pursuant to the terms of the stipulation, a final judgment was then entered in the amount of $10 million against Estes and its employees.
 

 After the approval of the settlement and the entry of the judgment, Perera was paid $5 million total by Estes, Cigna, and Chubb, each in accordance with the amount previously agreed to as part of the settlement. Perera executed a release of any further claims against Chubb.
 

 In March 2002, Perera, as Estes’ assign-ee, brought suit in the state trial court against USF & G for the remaining $5 million of the consent judgment, asserting two causes of action: breach of contract (seeking recovery of the $1 million policy
 
 *897
 
 limits) and bad faith (seeking recovery of the remaining balance). USF & G removed the case to federal court, after which the federal district court granted summary judgment in favor of Perera on the breach of contract claim, requiring USF & G to pay its policy limit of $1 million. USF & G has not challenged the decision regarding coverage and has paid $1 million, leaving $4 million of the consent judgment outstanding.
 

 With regard to the bad-faith cause of action, the federal district court found that no bad-faith action existed because Estes still had over $21 million in insurance coverage from Chubb at the time of settlement. The district court entered summary judgment in favor of USF & G, holding that without an excess judgment there can be no cause of action for bad faith. Perera appealed the district court’s decision to the United States Court of Appeals for the Eleventh Circuit. The Eleventh Circuit determined that the threshold factual issue of whether USF & G acted in bad faith held the potential to moot the case and remanded to the federal district court to have a jury consider that limited issue.
 

 At trial in the federal district court, the jury instructions contained stipulated facts, including that the $10 million consent judgment was reasonable in amount. The jury was instructed that “[a]n insurance company acts in bad faith in failing to settle a claim when, under all of the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured with due regard for its interests.” The jury was given the following factors to evaluate in determining whether USF & G acted in bad faith: (1) “the efforts taken by USF & G to resolve the coverage dispute promptly or in such a way as to limit any potential prejudice to Estes”; (2) “the substance of the coverage dispute or the weight of legal authority on the coverage issue that existed at the time of the dispute”; (3) “USF & G’s diligence and thoroughness in investigating the facts specifically pertinent to coverage”; and (4) “efforts made by USF & G to settle the liability claims in the face of the coverage dispute.” The jury was instructed that coverage had been determined to exist, but that factor was not controlling on the question of bad faith. However, with regard to the issue of damages, the jury was instructed that should it find USF & G liable for bad faith, “the issue of any damages will be decided at a later date.” The jury found that USF
 
 &
 
 G acted in bad faith.
 

 After the case returned to the Eleventh Circuit, the Eleventh Circuit agreed with the federal district court that there was no excess judgment against the insured because, as of the time the settlement agreement was negotiated, Estes had $1 million in coverage from the Cigna policy, $1 million in coverage from USF & G’s policy, and $25 million from the Chubb policy, but the judgment entered was for only $10 million.
 
 Perera,
 
 544 F.3d at 1275-76. The Eleventh Circuit further reasoned that Estes was never exposed to liability in excess of its policy limits because any such exposure was covered by the Chubb insurance, which had limits of $25 million.
 
 Id.
 
 After determining that Estes faced no liability above its existing policy limits (and accordingly no excess judgment), the Eleventh Circuit stated that it was not clear whether an excess judgment is a necessary part of a claim for bad faith under Florida law.
 
 Id.
 
 at 1276.
 

 The Eleventh Circuit then noted that USF & G made an alternative argument that even if an excess judgment is not required, Perera’s bad-faith claim was barred because the insured was never exposed to liability in excess of the limits of the policies.
 
 Id.
 
 at 1277. The court con
 
 *898
 
 sidered Perera’s sole argument on this point, which was that Estes was required to advance sums for which it would not otherwise have been liable in order to persuade Chubb to contribute to the settlement, even though the $1 million USF
 
 &
 
 G limit had not been paid.
 
 Id.
 
 This argument was rejected for two reasons: first, the record was clear that Chubb was committed to settling and did not refuse to do so before USF
 
 &
 
 G’s $1 million was paid; and second, even if Estes had paid the $1 million, it would have imposed on Estes an exposure of only $1 million.
 
 Id.
 
 The Eleventh Circuit, after rejecting Perera’s arguments, concluded that “Estes was never exposed to liability in excess of the limits of its several polices, because any exposure above USF & G’s limits was covered by the Chubb coverage with limits of $25 million.”
 
 Id.
 

 [6]
 

 The Eleventh Circuit held that Perera had waived two arguments. First, it noted that Chubb, the excess carrier in the instant case, had not asserted a bad-faith claim against USF & G and did not assign any such claim to Perera, and Perera did not argue entitlement to assert any rights of Chubb by virtue of subrogation or otherwise.
 
 Id.
 
 at 1277 n. 2. Thus, the Eleventh Circuit held that any such argument was deemed abandoned.
 
 Id.
 
 Second, it noted that Perera could have raised a potential factual issue of liability for punitive damages, but that any such argument had been waived.
 
 Id.
 
 at 1277 n. 4.
 

 ANALYSIS
 

 We begin with a brief overview of the relevant and well-established bad-faith law in this State. We then discuss the types of circumstances that have been recognized by case law as giving rise to a third-party bad-faith cause of action.
 
 [7]
 
 Finally, we examine the application of the law of bad faith to the facts of this case.
 

 Review of Relevant Case Law
 

 We start with the basic proposition that when an insurer is handling claims against its insured, it “has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business.”
 
 Berges v. Infinity Ins. Co., 896
 
 So.2d 665, 668 (Fla.2004) (quoting
 
 Boston Old Colony Ins. Co. v. Gutierrez,
 
 386 So.2d 783, 785 (Fla.1980)). This duty includes an obligation to settle “where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.”
 
 Boston Old Colony Ins. Co.,
 
 386 So.2d at 785. Breach of this duty may give rise to a cause
 
 of
 
 action for bad faith against the insurer.
 

 
 *899
 
 Although this case involves an indemnity policy, which requires the insured to undertake the defense of a claim,
 
 [8]
 
 the law imposes the same obligations regarding settlement as set forth in
 
 Boston Old Colony.
 
 It was the emergence of standard form liability policies that gave rise to the common law cause of action for bad faith,
 
 see Laforet,
 
 658 So.2d at 58; however, the duty of good faith in all respects, other than the duty to defend, also exists when the insurance policy is an indemnity policy. Thus, while an indemnity policy insurer’s duty of good faith does not encompass a duty to defend, it does include a duty of good faith when evaluating any settlement offers. That basic duty is not contested.
 

 We now turn to an examination of the recognized circumstances under Florida case law that may be relevant to this case, in which an insured or the third-party claimant, either on its own behalf or as the insured’s assignee, may bring a common law third-party bad-faith claim against an insurer for damages sustained as a result of the insurer’s bad faith.
 
 [9]
 
 Unless otherwise indicated, these circumstances apply regardless of whether the insurance policy at issue is an indemnity policy or a liability policy.
 

 The first widely recognized circumstance is the classic bad-faith situation where an excess judgment is entered against the insured. Under Florida law, it is clear that an insured or a third-party claimant may bring a third-party bad-faith cause of action when an insurer has breached its duty of good faith and that breach results in an excess judgment being entered against its insured.
 
 Berges,
 
 896 So.2d at 668.
 

 An excess judgment, however, is not always a prerequisite to a bad-faith action. The second recognized circumstance involves stipulations known as
 
 Cunning
 
 ham
 
 [10]
 
 agreements under Florida law. These agreements involve the situation where there is not a previous excess judgment but an insurer and a third-party claimant enter into an agreement and stipulate to try the bad-faith issues first. The parties further stipulate that if no bad faith is found, the third-party claimant will settle for the policy limits, thus protecting the insured from exposure to an excess judgment.
 
 Cunningham
 
 agreements have been held by this Court to be the “functional equivalent” of an excess judgment.
 
 Cunningham,
 
 680 So.2d at 182. This Court has explained:
 

 In
 
 Cunningham,
 
 we simply approved a procedure in which the parties could avoid the time and expense of going through a trial to obtain a final judgment. In following that procedure, the parties agree and the courts recognize that a stipulated final judgment has the same force and effect as a final judgment reached through the usual judicial labor of a trial when the parties agree that it shall.
 

 United Servs. Auto. Ass’n v. Jennings,
 
 731 So.2d 1258, 1260 (Fla.1999). Under a
 
 Cunningham
 
 agreement, the insurer’s actions protect the insured against an excess judgment.
 

 A third recognized circumstance also involves a settlement agreement but one that is entered into between the insured
 
 *900
 
 and the third-party claimant. The opportunity for a settlement without the agreement of the insurer traditionally has occurred where an insurer breaches its duty to defend, leaving the insured “to its own devices” to settle the case or proceed to trial. In those circumstances, the insured is left unprotected and may enter into a reasonable settlement agreement with the third-party claimant and consent to an adverse judgment for the policy limits that is collectable only against the insurer.
 
 Coblentz v. Am. Surety Co. of N.Y.,
 
 416 F.2d 1059, 1063 (5th Cir.1969);
 
 Steil v. Fla. Physicians’ Ins. Reciprocal,
 
 448 So.2d 589, 591 (Fla. 2d DCA 1984) (“By refusing to defend Steil’s claim, the carrier left Walker to his own devices to protect himself in the best way possible.”);
 
 see also Chomat v. N. Ins. Co. of N.Y.,
 
 919 So.2d 535, 537 (Fla. 3d DCA 2006);
 
 Gallagher v. Dupont,
 
 918 So.2d 342, 348 (Fla. 5th DCA 2005). These agreements are known as
 
 Coblentz
 
 agreements, based on the United States Fifth Circuit Court of Appeals case.
 

 Florida courts have also extended the reasoning of
 
 Coblentz
 
 to allow agreements by the insured to a judgment in excess of the policy limits against an insurer who wrongfully refuses to defend and acts in bad faith.
 
 See Shook v. Allstate Ins. Co.,
 
 498 So.2d 498 (Fla. 4th DCA 1986). No Florida case, however, has reached the issue of whether and under what circumstances a
 
 Coblentz
 
 agreement is valid and enforceable when an indemnity policy that does not include the duty to defend is involved.
 
 Cf. U.S. Fire Ins. Co. v. Hayden Bonded Storage Co.,
 
 930 So.2d 686, 690 (Fla. 4th DCA 2006) (recognizing an issue of whether a
 
 Coblentz
 
 agreement may be enforced when there is no duty to defend but deciding that the issue was moot because the insurer did not breach its duty to indemnify). Implicit in these decisions is a recognition that the insured would not have entered into the consent judgment but for the bad faith of the insurer and that the insured would otherwise have been exposed to personal liability as a result of the insured being left to “its own devices.”
 

 A fourth recognized circumstance involves a claim not of the insured or the third-party claimant, but of the excess carrier, which may bring a bad-faith claim against a primary insurer by virtue of equitable subrogation under certain circumstances where the primary insurer has not acted in good faith. Under the doctrine of equitable subrogation, an excess insurer has the right to “maintain a cause of action ... for damages resulting from the primary carrier’s bad faith refusal to settle the claim against their common insured.”
 
 U.S. Fire Ins. Co. v. Morrison Assurance Co.,
 
 600 So.2d 1147, 1151 (Fla. 1st DCA 1992) (citing
 
 Ranger Ins. Co. v. Traveler’s Indem. Co.,
 
 389 So.2d 272 (Fla. 1st DCA 1980)).
 

 The reasoning of the equitable sub-rogation cases is that the primary insurer is “held responsible to the excess insurer for improper failure to settle, since the position of the latter is analogous to that of the insured when only one insurer is involved.”
 
 Id.
 
 In other words, the excess insurer “stands in the shoes of the insured,” to whom the primary insurer directly owes a duty to act in good faith.
 
 U.S. Fire Ins. Co.,
 
 600 So.2d at 1151. Accordingly, when the primary insurer’s bad-faith refusal to settle causes the excess insurer to pay an amount greater than it would have had to pay if the primary insurer had acted in good faith, the excess insurer is entitled to maintain a common law bad-faith claim against the primary insurer.
 
 See Ranger,
 
 389 So.2d at 277. In this circumstance, there is an explicit requirement of a causal connection between the primary insurer’s bad-faith
 
 *901
 
 actions and the loss or damage suffered by the excess insurer.
 
 See id.
 
 at 276-77;
 
 see also Vigilant Ins. Co. v. Cont’l Cas. Co.,
 
 33 So.3d 734, 738 (Fla. 4th DCA 2010) (“[T]he insured, or the excess insurer standing in the shoes of the insured, is damaged because it has paid the judgment.
 
 It has paid money that it should not have been required to pay, absent the primary insurer’s bad faith.”
 
 (emphasis added)).
 

 Although an excess judgment is not always a prerequisite to bringing a bad-faith claim, the existence of a causal connection is a prerequisite-in other words, the claimed damages must be caused by the bad faith. These principles are further illustrated by the case of
 
 North American Van Lines v. Lexington Insurance Co.,
 
 678 So.2d 1325 (Fla. 4th DCA 1996), which involved indemnity policies. In
 
 North American,
 
 according to the allegations in the complaint,
 
 [11]
 
 the insured claimed that both the primary insurer and the excess insurer failed to act in good faith in attempting to settle the claim against the insured.
 

 The insured was covered by two insurance policies, one primary and one excess.
 
 Id.
 
 at 1327. Both policies were indemnity policies, which obligated the insured to handle all claims.
 
 Id.
 
 After an injured third party brought suit against the insured, the primary insurer repeatedly refused to tender its policy limits and the excess insurer also .refused, claiming that exhaustion of the primary insurer’s limits was a condition precedent to its liability.
 
 Id.
 
 at 1328. The primary insurer eventually tendered its policy limits, provided that the insured advance $1 million.
 
 Id.
 
 On the eve of trial, the injured third party made a settlement demand exceeding the primary insurer’s limits but within the excess insurer’s limits; however, the excess insurer still refused to authorize settlement.
 
 Id.
 
 The insured was faced with “near certainty of a large judgment against it, exceeding all available coverage” and was forced to contribute the balance of the funds necessary to settle the litigation, subject to a reservation' of its rights against its insurers — the total cost to the insured was $7 million.
 
 Id.
 
 The insured then brought suit against its insurers for claims of breach of contract, bad faith, and other claims.
 
 Id.
 
 The trial court held that “an excess judgment was a requirement for
 
 any
 
 action against an insurer arising from a refusal to settle” and dismissed the lawsuit in its entirety, including the breach of contract claims.
 
 Id.
 

 On appeal, the Fourth District Court of Appeal reversed and reinstated all counts of the complaint, holding that under the facts of the case an excess judgment was not necessary to assert the causes of action alleged.
 
 Id.
 
 at 1327. The Fourth District reasoned that neither insurer could “arbitrarily reject a reasonable settlement.... If they arbitrarily rejected a reasonable settlement, they breached their policy provisions, entitling [the insured] to settle the case and to seek reimbursement.”
 
 Id.
 
 at 1332-33. The Fourth District concluded that “under the facts of this case an excess judgment is not necessary to assert the causes of action alleged,”
 
 id.
 
 at 1327, “because the insured has paid an obligation for which the insurers should have been liable, had they not breached the contract.”
 
 Id.
 
 at 1333.
 
 [12]
 
 Accordingly, the circum
 
 *902
 
 stances in
 
 North American
 
 involve a situation where the insured alleged that both the primary and the excess insurer repeatedly failed to tender their limits, the settlement demand exceeded the primary insurer’s limits, and the insured was faced with “near certainty of a large judgment against it, exceeding all available coverage.”
 
 Id.
 
 at 1328. Further, the insured alleged it had paid funds to settle the case under an indemnity policy that it would not otherwise have had to expend because the insurer acted in bad faith by refusing to settle.
 

 In focusing on the insurer’s bad-faith failure to settle, forcing a payment of funds that would not otherwise have been expended had the insurers acted in good faith, the reasoning of
 
 North American
 
 is analogous to an equitable subrogation claim brought by an excess insurer. However, in
 
 North American,
 
 as in the equitable subrogation cases, there must be a causal connection between the damages claimed and the insurer’s bad faith.
 

 As can be seen under Florida law, an excess judgment is not always a prerequisite before a bad-faith case can be brought against the insurer. However, the damages claimed by the insured or its assignee must be caused by the insurer’s bad faith.
 

 Application of Law to Facts
 

 We next review whether Perera, as as-signee of Estes, can claim the $4 million remaining on the consent judgment as damages caused by USF & G’s bad faith. In our analysis, we review the application of bad-faith law to the facts of this case.
 

 First, we begin with the classic bad-faith case involving a judgment in excess of the policy limits and conclude that in this case there is no excess judgment because the consent judgment was within the limits of all applicable policies. We reject Perera’s argument that the $4 million is an excess judgment because the amount is in excess of Estes’ primary policy limits. We have previously stated that “[a]n excess judgment is defined as the difference between all available insurance coverage and the amount of the verdict recovered by the injured party.”
 
 Jennings,
 
 731 So.2d at 1259 n. 2 (citing
 
 McLeod v. Cont’l Ins. Co.,
 
 591 So.2d 621 (Fla.1992)). Clearly, Estes had multiple policies, including excess coverage, because it wanted to protect itself against liability for a verdict in excess of USF & G’s policy limits. Therefore, the classic bad-faith cause of action is not available to Perera as Estes’ assignee.
 

 Second, this case does not involve a
 
 Cunningham
 
 agreement where the insurer protects the insured by agreeing to try the bad-faith issues first and stipulate to an amount of damages. In this case, USF & G did not participate in any such agreement, and Chubb agreed to the settlement but did not agree to pay $10 million contingent on a finding of bad faith.
 

 Third, we address the potential applicability of
 
 Coblentz.
 
 Although
 
 Coblentz
 
 agreements have arisen in the context of liability policies, where there is a breach of the duty to defend, we do not reject the application of
 
 Coblentz
 
 to indemnity policies. Perera argues that under Florida law, an insured is not required to put its personal assets on the line to settle a case
 
 *903
 
 in which its insurer acts in bad faith; rather, Perera asserts, the insured may enter into a settlement that assigns to the plaintiff the insured’s rights against the insurer in exchange for a release from personal liability. As a general proposition, Perera is correct; however, it does not apply to the facts of this case.
 

 In this case, the insured was not actually “left to its own devices” regarding settlement. The insured had in effect both an additional primary insurer through Cigna and excess insurance in the amount of $25 million through Chubb. At all times Cigna was willing to pay its policy limits and Chubb was willing to negotiate settlement from its excess insurance policy even without USF & G’s participation. In fact, Chubb took an active role in settlement negotiations, ultimately paying only $8.75 million of the $10 million consent judgment, far below its policy limits of $25 million.
 

 We next address the applicability of equitable subrogation, where the excess carrier pays monies it would not otherwise have been obligated to pay if the primary insurer had acted in good faith. This type of claim, which may be assigned to a third-party claimant, is not applicable here. In this case, Chubb did not assign to Perera any potential cause of action it may have had against USF & G by virtue of equitable subrogation.
 
 [13]
 
 In fact, under the terms of the agreement, Perera actually executed a release of liability of any further claims against Chubb.
 

 Finally, we address whether the facts of this case are analogous to the facts in
 
 North American
 
 and conclude that the facts of this case are distinguishable. Here, Perera is not claiming Chubb acted in bad faith. In fact, Chubb actively engaged in settlement negotiations without requiring the involvement of USF & G. Further, the other primary insurer for Estes’ employees also remained willing to contribute its policy limits.
 

 Unlike
 
 North American,
 
 the facts do not reveal a situation in which the insured faced the “near certainty of a large judgment against it, exceeding all available coverage.”
 
 [14]
 
 To the contrary, the settlement demands made by Perera during the course of litigation to that point — ranging from $12 million demanded just before mediation in March 2001 to $7 million shortly before settlement in August 2001 — always exceeded the limits of the primary policies (Cigna’s $1 million limits and USF & G’s $1 million limits) and were always well below the limits of the combined insurance policies. There is absolutely no indication from this record that the case, had it gone to trial, would have resulted in a jury verdict in excess of the combined insurance policies.
 

 This case is also unlike
 
 North American
 
 because Estes did not pay funds that it would not have had been obligated to pay had USF & G acted in good faith. No such damages have been claimed. Rather, Perera, as Estes’ assignee, is seeking part of an unpaid consent judgment as damages.
 

 As our review of the case law demonstrates, there must be a causal connection between the damages claimed and the in
 
 *904
 
 surer’s bad faith. Perera appears to argue a causal connection by asserting that Estes and Chubb intended to reduce Chubb’s coverage in exchange for a waiver of the $1 million attachment point of Chubb’s policy.
 
 [15]
 
 This, Perera claims, is a direct result of USF & G’s bad-faith refusal to tender its $1 million policy limits, by which USF
 
 &
 
 G created a “hole” in Estes’ coverage, leaving it with the limited options of either paying $900,000 out of pocket (representing the remainder of the USF & G policy since USF & G only offered $100,000) in order for Chubb to settle or allowing a “dangerous and deteriorating case to proceed to trial and judgment.” Thus, she argues, when Chubb agreed to waive the $1 million attachment point in exchange for a reduction in its policy limits, it was in Estes’ best interest to settle.
 

 Perera’s argument fails because the record indicates that Chubb was ready to settle even if the $1 million attachment point was not waived. Chubb offered $1.25 million at mediation in March 2001, $3.5 million in the months following mediation, and $4.25 million in August 2001, just prior to when the parties entered into the settlement agreement. While at least one of Chubb’s settlement offers was a global settlement in which Chubb reserved its right to pursue USF
 
 &
 
 G for indemnity or contribution, there is no evidence in the record that any of these offers were contingent upon USF & G’s $1 million limits being exhausted. Nor was there evidence that the case was “dangerous and deteriorating” in the sense that Estes was exposed to liability in excess of the policy limits. Accordingly, the facts of this case do not support Perera’s argument.
 

 Estes, as a business entity, purchased both primary and excess insurance policies to protect itself from personal liá-bility. Unquestionably, both the primary and excess carriers have obligations toward their insured to act in good faith in evaluating settlement opportunities and settling a case where, as the jury was instructed in this case — in conformity with Florida law — “under all of the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured with due regard for its interests.” Estes’ excess carrier, Chubb, and one of its primary carriers, Cigna, honored their obligations to their insured and negotiated in good faith. As found by the jury, USF & G did not.
 

 However, in this case, regardless of whether USF & G should have promptly paid its policy limits, there is no causal connection between USF & G’s bad faith and the damages claimed. The following facts are important to the resolution of this question: there was a substantial excess policy protecting Estes, Chubb was willing to negotiate a settlement without contribution from USF
 
 &
 
 G, Estes did not face exposure to liability in excess of the combined policies, and Chubb did not choose to either bring a bad-faith claim against USF & G or assign its claim to Perera.
 

 CONCLUSION
 

 Based on the facts of this case, we conclude that USF & G’s actions did not cause Estes to sustain the claimed damages of $4 million or to be exposed to liability in excess of its policy limits. Accordingly, Perera, as Estes’ assignee, is not entitled to recover the unpaid portion of the consent judgment. We answer the rephrased certified question in the negative and return this case to the Eleventh Circuit.
 

 It is so ordered.
 

 
 *905
 
 QUINCE, C.J., and LEWIS, CANADY, LABARGA, and PERRY, JJ., concur.
 

 POLSTON, J., concurs in result.
 

 [1]
 

 . The two certified questions are:
 

 1. CAN A CAUSE OF ACTION FOR BAD FAITH AGAINST AN INSURER BE MAINTAINED WHEN THERE IS NOT AN EXCESS JUDGMENT AGAINST THE INSURED?
 

 2. EVEN IF AN EXCESS JUDGMENT IS NOT ALWAYS REQUIRED, CAN A CAUSE
 
 *895
 
 OF ACTION FOR BAD FAITH AGAINST AN INSURER BE MAINTAINED WHEN THE INSURER'S ACTIONS NEVER RESULTED IN INCREASED EXPOSURE ON THE PART OF THE INSURED TO LIABILITY IN EXCESS OF THE POLICY LIMITS OF INSURED'S POLICIES?
 

 Perera v. U.S. Fid. & Guar. Co.,
 
 544 F.3d 1271, 1276, 1279 (11th Cir.2008).
 

 [2]
 

 . In setting forth the facts, we rely on the Eleventh Circuit's opinion as well as facts in the trial court record from the bad-faith case.
 

 [3]
 

 . USF & G actually issued a reservation of rights letter but its position was later found by the magistrate judge in the federal case to be effectively a denial of coverage, not a reservation of rights.
 

 [4]
 

 . There is absolutely no indication that this claim could possibly have been settled within the limits of the primary insurance policies.
 

 [5]
 

 . In addition to paying $750,000 toward settlement, Estes also paid $609,317.78 in attorneys’ fees and costs (since it was obligated to provide its own defense as all of the policies were indemnity policies), $100,000 in worker's compensation indemnity to Perera, $5000 in medical payments, and $6,058.74 in expenses.
 

 [6]
 

 . Although it appears that Perera claimed in the Eleventh Circuit that Estes paid money it would not otherwise have paid had USF & G acted in good faith, Perera is not seeking any such sums as damages, but rather is seeking as damages the $4 million unpaid portion of the consent judgment.
 

 In addition, the $750,000 paid by Estes as part of the consent judgment included the $500,000 deductible for the Cigna policy Estes was required to pay. There is some indication in the record that the remaining $250,000 was additional money paid by Estes in order to further settlement. Whether Estes was required to pay all or part of the $250,000 is not clear because it had a $350,000 self-insured retention under the USF & G policy, of which a certain amount had already been expended for defense costs. However, Perera is not claiming any portion of the $750,000 Estes paid as damages in the bad-faith action.
 

 [7]
 

 . We do not intend to limit the types of bad-faith claims that may be brought in other cases to only the case law discussed in this opinion. We discuss the case law only to determine whether the principles from prior bad-faith case law may be relevant to the facts of this case.
 

 [8]
 

 .
 
 See State Farm Mut. Auto. Ins. Co. v. Laforet, 658
 
 So.2d 55, 58 (Fla.1995). In contrast, under liability policies, insurers undertake the obligation to defend.
 
 Id.
 

 [9]
 

 . Section 624.155(l)(a), Florida Statutes (2009), sets forth additional grounds for bad faith, including unfair claims practices. These additional grounds are not relevant to this case and are thus not discussed further.
 

 [10]
 

 . Cunningham v. Standard Guar. Ins. Co.,
 
 630 So.2d 179, 182 (Fla.1994).
 

 [11]
 

 . The Fourth District accepted the facts contained in the complaint as true because it was evaluating an order dismissing a complaint for failure to state a cause of action.
 
 Id.
 
 at 1327.
 

 [12]
 

 . The Fourth District also opined, although it was not argued by the parties, that the case presented an “excess situation” because although the primary insurer actually tendered its policy limits, its delay required the insured to expend additional funds in defending the
 
 *902
 
 case.
 
 Id.
 
 at 1333
 
 n. 4.
 
 “Therefore,” the court concluded, "in a very real sense, the failure of the insurance company to pay a reasonable settlement exposed the insured to expenses of settlement and defense in excess of the policy amounts.”
 
 Id.
 
 However, neither Estes nor Perera, as Estes’ assignee, claims that USF & G’s bad-faith refusal to settle required Estes to expend additional attorneys’ fees. Thus, that issue is not before us in answering the certified question and we do not reach it.
 

 [13]
 

 . Had Chubb assigned a claim of equitable subrogation, Perera may have been able to bring a bad-faith claim based on damages sustained by Chubb in the amount of any difference between what Chubb actually paid and the amount it would have paid had USF & G settled in good faith.
 

 [14]
 

 . Although there was the possibility of punitive damages had the case gone to trial, the Eleventh Circuit held this argument to be waived and therefore we do not consider it.
 

 [15]
 

 . Chubb's policy provided that Chubb would not be obligated to pay anything until the primary insurers’ policy limits were exhausted.