Charles R. HINSON, Plaintiff,

v.

TITAN INSURANCE COMPANY and Titan Indemnity Company, Defendants.

Case No. 3:13–CV–394–MCR–EMT

United States District Court, N.D. Florida, **Pensacola Division.**

Signed September 6, 2015

---

Jonathan Robert Mayes, Robert Joseph Mayes, Mayes Law Firm PA, Gulf Breeze, FL, for Plaintiff.

B. Richard Young, Amanda Leigh Kidd, Michael Todd Bill, Michael Justin Lusko, Adam A. Duke, Young Bill Roumbos etc. PA, Pensacola, FL, for Defendants.

## ORDER

M. CASEY RODGERS, CHIEF UNITED STATES DISTRICT JUDGE

This is a bad faith lawsuit filed by Plaintiff Charles R. Hinson against his insurer, Defendants Titan Insurance Company ("Titan Insurance") and Titan Indemnity Company ("Titan Indemnity") (or collectively, "Titan").[1] Titan removed the case from state court and has filed a Motion for Summary Judgment (doc. 68). After considering the Parties' arguments and the record, the Court finds the motion is due to be granted.

### Background

Hinson was involved in an automobile collision with a motorcycle driven by Martin Almand on September 27, 2007, in which Almand suffered serious injuries and his motorcycle sustained heavy damage. At the time of the accident, Hinson was insured under a Titan Auto Insurance Policy bearing Titan Indemnity Company's name,[2] with policy limits of $10,000 per

---

1. Originally, W.I. of Florida, Inc. was also named as a Defendant in this action, but the claims against W.I. were dismissed without prejudice by stipulation on July 26, 2013 (Doc. 12).

2. The record is not as clear as the policy suggests regarding which company issued the policy or the relationship between the Defendants. Although Titan Indemnity is referenced on the policy, the letters from claims adjusters and their claim notes bear the name Titan Insurance. Also, an affidavit from a Titan Insurance employee states that Plaintiff was insured by Titan Insurance.

person for bodily injury (with a limit of $20,000 per occurrence) and $10,000 of property damage coverage. Hinson reported the accident to his insurer the following day, September 28, 2007. The same day, Claims Adjuster Kelly Collins spoke with Almand's wife and learned he was in intensive care for a crushed leg, on which he had undergone surgery. Collins sent Hinson a letter explaining his coverage ($10,000 bodily injury and $10,000 property damage) and informing him that Almand's injuries could exceed policy limits. The letter also explained to Hinson that he could be personally liable for any excess judgment. Later that day, Collins spoke with Hinson by telephone, explained the information she had written in the letter, and obtained his recorded statement of the incident.[3] According to Hinson, he stopped at a stop sign but saw no vehicles coming, so he proceeded into the intersection. The right fender of Hinson's vehicle struck Almand's motorcycle, which Hinson had not seen, and Almand was thrown over the vehicle. Hinson received a citation.

Collins quickly concluded that Hinson would likely be found at fault for the accident. She established reserves at the bodily injury policy limit in anticipation of a later pay-out to Almand. Collins's notes on September 28 documented investigative steps completed at that point as well as those outstanding, and stated that, on review of the file, coverage and liability needed to be confirmed and once that is completed, "we need to consider [bodily injury] settlement—asap due to serious injuries." The notes also reflect that an appraisal of damages to the motorcycle

was requested the same day, and the auto mechanic indicated the motorcycle would be inspected on October 2.

On October 1, Collins learned that the cost of Almand's medical care to date had reached approximately $69,000, and she immediately sent a settlement letter to Almand offering to pay the full $10,000 Bodily Injury limit, with a proposed "Release of All Claims" attached for Almand's signature. The attached Release informed Almand that his signature would release all claims of whatever nature he might have against Hinson and any and all others for personal injuries and/or property damage resulting from the incident. By letter dated October 16, Almand's counsel, Bobby Bradford, replied that he was investigating the matter and that Almand was not in a position to settle at that time.[4]

Titan sent another offer of bodily injury policy limits on November 7, 2007, and delivered a tender of full policy limits for the bodily injury claim on November 19, which was also rejected. The adjuster's file indicates that Titan was also working toward settling the property damage claim (see doc. 69–3, at 181). The notes reflect that in December, Titan was still reviewing valuations regarding this claim.

On December 26, Titan received a letter from Almand's attorney, Bradford, dated December 21 with a time-limited demand to settle in exchange for payment of the Bodily Injury policy limits; $6,500 plus interest for property damage to the motorcycle and the cost of listed upgrades on the motorcycle; and an affidavit from Hinson identifying any other applicable insurance.

---

3. Collins was aware that Almand's motorcycle was involved in the accident and likely damaged, but there was no appraisal yet. She explained in the September 28 letter to Hinson that his insurance coverage was limited to $20,000 for this accident and that it was probable that Almand's case would have a

value in excess of the policy limits based on the injuries.

4. In his deposition, Bradford testified that he would not have recommended that any client sign the October 1 release. (Doc. 72–1 at 94, lines 5–12).

The letter demanded compliance with all terms within 20 days, making January 10, 2008, the deadline for satisfaction of all conditions. Lisa Moore was handling the claim for Titan at this time.[5] On January 2, Moore attempted to contact Hinson by phone but instead reached his fiancée, Alice Kilpatrick.[6] Moore told Kilpatrick about the settlement offer and the need for Hinson to complete an affidavit. Moore's notes reflect that Kilpatrick responded by saying she would have Hinson call Moore. When Moore had not heard from him, she again attempted unsuccessfully to telephone Hinson on January 3 and 4, and she sent him a letter on January 4, informing him of Almand's December 2007 demand letter and including a copy of the demand letter, an affidavit for Hinson to execute, and a fax number to return the signed and notarized affidavit. The letter stated that the affidavit was part of the demand and that "[i]t is very important that you have this completed immediately."[7] Moore explained again the possibility of a lawsuit and excess verdict and advised Hinson to contact an attorney. In addition to sending the letter, Moore asked Claims Manager Jeff Neu, who was located in Pensacola, to hand-deliver a copy of the affidavit to Hinson's home, which Neu testified he did. Hinson was not home, and Neu delivered the affidavit to Kilpatrick. Hinson testified by deposition that no affidavit was hand delivered to him and that Kilpatrick never told him of documents being delivered to the house. Hinson also denied seeing the letter and said he would have

opened mail from Titan if he had received any, but when asked if he *could* have received it, he admitted that it was possible.

On January 10, the day Bradford's 20-day deadline for acceptance of the demand expired, Moore responded to the letter, providing two settlement checks issued by Titan Insurance Company, one for $10,000 for bodily injury and another for property damage in the amount of $10,750.51. Hinson, however, had not provided the requested affidavit of no other insurance. Although Moore did not request an extension of time to obtain the affidavit, she explained her efforts to reach Hinson and stated she would continue attempts to reach him and would forward the affidavit upon receipt. Bradford returned the checks on January 16, because Titan had failed to comply with the terms of the demand (only Hinson's affidavit had not been timely provided), and he also informed Titan that Almand would proceed with litigation.

On January 23, Moore sent Hinson a letter informing him that a lawsuit might soon be filed against him and providing a number he should call to inform her if he received suit papers. The claims adjuster's notes reflect that Moore had a long discussion with Hinson over the telephone on February 1 when he called to inform her that he had been served with Almand's lawsuit. Moore's notes reflect that he told her he had been busy and could not get to an office to fax the affidavit. Moore ad-

---

5. Hinson disputes whether Moore was a claims adjuster. She testified in her deposition that she was a quality assurance consultant. Moore said did not investigate the claim or the possibility of whether other insurance was available, except to request the information from Hinson.

6. Kilpatrick is identified as a "driver" on the policy. (Doc. 69–1, at 3). She passed away shortly after this suit was filed.

7. Although Moore's letter to Hinson did not itself mention the 20–day deadline, it plainly informed him that the affidavit was part of the demand and needed to be completed "immediately." Moore's letter referenced the enclosed demand letter, which expressly addressed the 20–day limit.

vised him that Titan would assign an attorney to represent him and instructed Hinson to use a fax machine at a nearby Nationwide office. Although Hinson followed her instruction and faxed the affidavit to her the same day, in his deposition, Hinson denied any recollection of this phone call with Moore, and he did not recall faxing the affidavit or going to an insurance office to do so. He also did not recall how he came to have or sign the affidavit.[8] Hinson's attorney forwarded the affidavit to Bradford on February 14, 2008. Almond nonetheless proceeded to trial.

The state court jury found Hinson liable and awarded Almand a verdict in excess of policy limits.[9] After the verdict but before final judgment was entered, Bradford sent Hinson's defense counsel another proposal (doc 69–22), offering to stay execution on the remaining judgment until after Hinson pursued a bad faith suit and assigned any proceeds to Almand, and regardless of the outcome, at the conclusion of the bad faith litigation, Hinson would be released and the judgment satisfied. In exchange, the proposal required Hinson and Titan to agree not to pursue an appeal, and Titan would pay the policy limits for bodily injury and property damage coverage (for which a partial satisfaction of judgment would be executed). Hinson's attorney discussed the offer with Titan adjuster Lisa Brosious–Shaw, who was then handling the claim, but rather than accept the offer, Titan decided to appeal. Brosious–Shaw admitted in her deposition that the post-verdict offer, which Titan rejected, would have protected Hinson from the ex-

cess judgment. The state court judgment was affirmed on appeal.

Hinson filed the instant bad faith lawsuit, and Titan has moved for summary judgment.

## Standard of Review

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, "shows that there is no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Pursuant to Rule 56, summary judgment is warranted "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law, and it is "genuine" if the record taken as a whole could lead a rational fact finder to find for the non-moving party. *Id.* Summary judgment is not appropriate "if a reasonable fact finder evaluating the evidence could draw more than one infer-

---

**8.** Plaintiff answered almost every question in his deposition with "I don't know" or "I don't remember."

**9.** The jury awarded Almand $1,968,392.42 and awarded $140,000 to his wife. The claims adjuster notes on January 12, 2010, just prior to trial, indicated that there was

little to no liability argument to be made for comparative negligence, that Hinson would likely be found 100% liable, that Hinson had no assets, and that Titan had nothing other than policy limits to offer, and Hinson was aware of his potential exposure to an excess verdict.

ence from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.,* 64 F.3d 590, 594 (11th Cir.1995). When assessing the sufficiency of the evidence, the court must view all the evidence and draw all reasonable factual inferences in the light most favorable to the nonmoving party. *See Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 918 (11th Cir.1993).

**Discussion**

 Under Florida law, an insurer has a duty to act in good faith when handling a claim against its insured, using "the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *See Perera v. U.S. Fid. & Guar. Co.,* 35 So.3d 893, 898 (Fla.2010). An insured may sue for damages in excess of the policy limits if the insurer acts in bad faith in handling the claim.[10] *See id.* To prevail on a bad faith claim, the insured must demonstrate bad faith in the handling of the claim and also show "a causal connection between the damages claimed and the insurer's bad faith." *Id.* at 903–04; *see also Mesa v. Clarendon Nat'l Ins., Co.,* No. 14–12868, 799 F.3d 1353, 1358–60, 2015 WL 5059496, at *4–5 (11th Cir. Aug. 28, 2015).

 The insurer's duty to handle a claim in good faith includes the duty to attempt settlement " 'where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.' " *Perera,* 35 So.3d at 898 (quoting *Boston Old Colony Ins. Co. v. Gutierrez,* 386 So.2d 783, 785 (Fla.1980)). The duty of good faith also includes a fiduciary duty to act in the insured's best interests. *See Berges v. Infinity Ins. Co.,* 896 So.2d 665, 677 (Fla. 2004); *see also State Farm Mut. Auto. Ins. Co. v. Laforet,* 658 So.2d 55, 58 (Fla. 1995) (stating insurer's good faith duty includes a duty to "refrain from acting solely on the basis of [its] own interests in settlement"). In this regard, the insurer is obligated to investigate the facts, to fairly consider a settlement offer that is not unreasonable in light of the facts, to "advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same." *Boston Old Colony Ins.,* 386 So.2d at 785. Bad faith "is determined under the totality of the circumstances standard." *Berges,* 896 So.2d at 680; *see also Mesa,* 799 F.3d at 1359, 2015 WL 5059496, at *4. While negligence alone does not amount to bad faith, negligence is relevant to the question of good faith because the duty of good faith involves diligence and care in the investigation and evaluation of the claim. *Boston Old Colony,* 386 So.2d at 785. However, the duty of good faith does not require an insurer to "act perfectly, prudently, or even reasonably. Rather, insurers must 'refrain from acting solely on the basis of their own interests in settlement.' " *Novoa v. Geico Indemnity Co.,* 542 Fed.Appx. 794, 796 (11th Cir.2013) (unpublished)[11] (quoting *State Farm Mut. Auto. Ins. Co. v. Laforet,* 658 So.2d 55, 58 (Fla.1995)).

 Because the issue of bad faith involves a determination of whether the insurance company acted with reasonable diligence, ordinary care, or due regard for

---

**10.** Because federal jurisdiction in this case is based on diversity, the Court applies the law of the forum state, which is Florida. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Interline Brands, Inc. v. Chartis Spe-* *cialty Ins. Co.,* 749 F.3d 962, 965 (11th Cir. 2014).

**11.** Unpublished opinions are not binding, but they may be considered persuasive authority. *See* 11th Cir. R. 36–2; *see also United States v. Futrell,* 209 F.3d 1286, 1289 (11th Cir.2000).

the insured, it is generally a question of fact for the jury. *See Berges,* 896 So.2d at 680; *Boston Old Colony,* 386 So.2d at 785; *Campbell v. Gov't Employees Ins. Co.,* 306 So.2d 525, 530–31 (Fla.1974). Notwithstanding, the Florida Supreme Court and the Eleventh Circuit (applying Florida law) have both recognized that in certain circumstances, a court may conclude as a matter of law that an insurance company could not be liable for bad faith. *See Mesa,* 799 F.3d at 1358–60, 2015 WL 5059496, at *4–5 (affirming summary judgment on finding no reasonable juror could conclude that the insurer acted in bad faith where insurer promptly began working on a global settlement and the bad faith claim was based on only negligence that did not cause the excess verdict); *Berges,* 896 So.2d at 680 (citing as an example a case in which no duty was owed because of the absence of an excess judgment); *see also Maldonado v. First Liberty Ins. Corp.,* 342 Fed.Appx. 485, 487–88 (11th Cir.2009) (affirming summary judgment where insured had refused to submit a financial affidavit as requested by the claimant and the insurer had communicated the risks of an excess judgment); *Novoa,* 542 Fed.Appx. at 796 (finding no evidence of bad faith by claims processing blunders); *Caldwell v. Allstate Ins. Co.,* 453 So.2d 1187, 1190 (Fla. 1st DCA 1984) (affirming summary judgment for insurer where it could not reasonably be said that the insurer was guilty of bad faith).

 Titan argues that no facts support a finding of bad faith because it promptly and repeatedly attempted to settle Almand's claim for policy limits on Hinson's behalf, and any mistakes in claims handling did not amount to bad faith. Having carefully considered the record in the light most favorable to Hinson, the Court agrees with Titan. Although Hinson lists several ways in which he believes the record creates a question of fact as to bad faith, the record reflects that Titan offered to settle the case for bodily injury policy limits in exchange for a full release within a matter of days after the accident occurred and immediately upon learning the extent of Almand's injuries. This offer was made the same day the claims adjuster confirmed that the medical expenses already exceeded the bodily injury policy limits by $59,000. Hinson asserts a reasonable jury could find that Titan acted in its own interests and in bad faith by first proposing an unreasonable release that did not offer any amounts for Almand's property damage. On this record, however, where the offer of full policy limits based on documented medical expenses was extended so early that there was not yet even a property damage estimate, a reasonable jury could not infer bad faith from the failure at that time to also offer an amount for property damage to the motorcycle. From that point, it was clear that the bodily injury claim far exceeded policy limits. From the outset, Hinson was informed of this and the possibility of an excess verdict. Although there was little reason to believe that Almand would settle for policy limits, Titan offered policy limits again in November 2008, which Almand rejected.

 While the record reflects that there was a possibility of settlement in January 2009 with Almand's time limited demand, it is also undisputed that Hinson failed to timely return the required affidavit to meet the demand. Hinson argues there is a question of fact because he denied receiving the demand and argues Titan failed to make a diligent effort to timely deliver and secure his affidavit regarding other insurance, but the record does not support these assertions.[12] The

---

12. Likewise, although Hinson argues that Moore failed to investigate the claim and whether he had additional insurance, the un-

record reflects that Moore sent a letter to Hinson's address, made several telephone calls to his number, and arranged for personal delivery of the affidavit to his home. Although the Court has considered and accepts Hinson's deposition testimony that he did not see the letter or receive mail from Titan, in light of Moore's undisputed efforts to obtain the affidavit, the Court finds that Hinson has not demonstrated a question of material fact as to whether Titan acted in bad faith. The fact that he did not receive or see the letter or affidavit does not contradict the claims adjusters' contemporaneous notes and testimony about their actions and efforts; and, although Hinson could not recall this either, he did follow Moore's instructions to fax the affidavit from the Nationwide office, when she finally reached him by telephone after the 20-day deadline had expired. Even assuming that Moore could have attempted to call at better times or more often, as Hinson suggests, or that she should have requested an extension of time to return the affidavit, this amounts to negligence, at best, and falls far short of showing that, under the totality of the circumstances, Titan was acting solely in its own best interests and to Hinson's detriment. The record shows that Moore attempted to notify Hinson and timely responded to Almand's demand on Hinson's behalf with everything required, except for the affidavit, which Hinson was responsible to provide. The totality of the circumstances demonstrate that Titan diligently pursued a settlement; advised Hinson of the risks of an excess judgment, of settlement opportunities, and the probable outcome of the litigation; and tendered checks on more than one occasion, but that Almand (whose medical bills far exceeded the policy limits) refused to settle because

his demand was not completely met within his 20-day deadline—a factor attributable to Hinson. *See Maldonado*, 342 Fed. Appx. at 487–88 (stating the record showed that the insurer had communicated the risks of an excess judgment and the cause of the failure to settle was the insured's refusal to execute an affidavit). On this record, the failure to meet the 20-day deadline of Almand's demand letter cannot fairly be attributed to Titan's bad faith.

 As to Hinson's claim that Titan acted in bad faith in rejecting the post-verdict proposal, which would have completely protected Hinson from the excess judgment, Titan argues it had no obligation to accept such an offer, characterizing it as a *Cunningham* agreement. *See Cunningham v. Standard Guaranty Insurance Co.*, 630 So.2d 179, 181 (Fla.1994) (stating that a trial court has jurisdiction to decide the bad faith issue before any determination of liability on the underlying claim if the parties have stipulated to this procedure). A *Cunningham* agreement is one in which the insured, third-party claimant and insurer stipulate to try the bad faith claim first, and if no bad faith is found, then they agree the insured will be released in exchange for payment of the policy limits, thus protecting the insured from an excess judgment and avoiding a time-consuming trial on negligence. *See Cunningham*, 630 So.2d at 181. Although this type of agreement offers the insured complete protection from an excess judgment, courts have concluded that an insurer's failure to enter into a *Cunningham* agreement does not constitute bad faith. *See Berges*, 896 So.2d at 671 n. 1 (finding no merit in a bad faith claim based on refusal to enter a *Cunningham* agree-

disputed record reflects that Titan investigated the claim before Moore was assigned to the file and that Moore made several attempts

to notify Hinson of the demand and to obtain his affidavit regarding the existence of other insurance.

ment); *see also Keifer v. Gov't Employees Ins. Co.*, No. 01–15545, 2002 WL 34924509, at *3 (11th Cir. May 7, 2002) (unpublished) ("Plaintiff cites no Florida precedent—and we are aware of none—that suggests that an insurer must enter into such an agreement to avoid claims of bad faith."); *Hayas v. GEICO Gen. Ins. Co.*, No. 8:13cv1432, 2014 WL 6883131, at *7 (M.D.Fla. Dec. 5, 2014) (finding the insurer's "failure to enter into a *Cunningham* agreement that would have protected [the insured] does not constitute bad faith"). The court in *Hayas* noted that there was no authority cited to indicate that the failure to enter into such an agreement could even be considered in the bad faith determination when evaluating the totality of the circumstances. *See Hayas*, 2014 WL 6883131, at *7.

Hinson argues that this was not a *Cunningham* agreement, that there are no cases on point, and that because his interests diverged from Titan's with respect to the post-verdict offer, Titan acted solely in its own best interests in rejecting it. Hinson maintains that, despite Almand's post-verdict proposal's requirement to give up appeal rights, this was nonetheless an offer that could have been accepted, *see Giovo v. McDonald*, 791 So.2d 38, 39 (Fla. 2d DCA 2001) ("Parties are free to contract for any terms not prohibited by law or contrary to public policy."), and that there was no procedural shortcut here, as involved in a traditional *Cunningham* agreement.

 The Court finds no practical reason to differentiate between this post-verdict proposal and a *Cunningham* agreement for purposes of determining whether Titan acted in bad faith and finds them sufficiently analogous for the Court to conclude that Titan was not under a good faith obligation to accept Almand's post-verdict proposal. Hinson has cited no case law supporting his assertion that rejecting this type of agreement can be considered bad faith. The post-verdict timing difference does not create a meaningful distinction because the proposal here was also a procedural shortcut in the sense that it would have eliminated Titan's and Hinson's appeal rights, and, similar to a traditional *Cunningham* agreement, it also would have completely protected Hinson from the excess judgment. Thus, like a *Cunningham* agreement, rejecting this proposal does not support a finding of bad faith. Even considering the proposal under the totality of the circumstances, no inference of bad faith arises. Hinson's attorney was aware of the proposal,[13] and no reasonable jury could find that Titan acted in bad faith by pursuing an appeal on behalf of Hinson. Also, even assuming Titan acted solely in its own interests by rejecting the proposal, this is immaterial because a reasonable jury could not find

---

**13.** Also, the duty of good obligates an insurer "to advise the insured of settlement opportunities." *Boston Old Colony*, 386 So.2d at 785. Concealing or misrepresenting a post-verdict offer could be considered as part of the totality of the circumstances when evaluating whether the insurer acted with bad faith toward its insured. *See Campbell*, 306 So.2d at 531 (noting an insurer's concealment from the insured of a post-trial offer to settle and misrepresenting the gravity of the claim and falsely advising that the insured would still be required to pay over $5,000 evidenced reckless disregard of the rights of the insured).

Here, although it is undisputed that Titan was in control of the litigation decisions, and Titan made the decision to appeal instead of accepting the post-verdict proposal, the record is also clear that the post-verdict offer was not concealed from Hinson. To the contrary, Bradford's post-verdict proposal was sent directly to Hinson's attorney. Further, the claims adjuster's notes indicate that the proposal was discussed between the adjuster and Hinson's attorney. There are no facts even suggesting a reckless disregard of Hinson's rights.

that the failure to enter this post-verdict proposal *caused* the excess judgment. *See Perera,* 35 So.3d at 903–04 (stating an insurer is responsible for an excess judgment that is *caused* by its bad faith); *see also Mesa,* 799 F.3d at 1360, 2015 WL 5059496, at *5 (noting there must be proof of "a causal connection between the damages claimed and the insurer's bad faith," quoting *Perera* ). Having fully considered the record, the Court finds no genuine issue of material fact from which a jury could find that Titan acted in bad faith in handling Almand's claim against Hinson.

Accordingly, Defendants' Motion for Summary Judgment (Doc. 68) is **GRANTED**. The Clerk is directed to enter summary final judgment in favor of Defendants and against Plaintiff, who shall take nothing. The Clerk is directed to tax costs against the Plaintiff and close the file.

**DONE AND ORDERED.**