# Supreme Court of Florida

_____

No. SC17-85
_____

**SUZANNE HARVEY, etc.,**
Petitioner,

vs.

**GEICO GENERAL INSURANCE COMPANY,**
Respondent.

September 20, 2018
**<u>CORRECTED OPINION</u>**

QUINCE, J.

This case involves the application of the law of bad faith, which imposes a

fiduciary obligation on an insurer to protect its insured from a judgment that

exceeds the limits of the insured's policy. The specific issue in this case is whether

the Fourth District Court of Appeal misapplied this Court's bad faith precedent and

relied on inapplicable federal precedent when it reversed the judgment entered in

favor of the insured after a jury found that the insurer acted in bad faith in failing to

settle the claim. *GEICO Gen. Ins. Co. v. Harvey*, 208 So. 3d 810, 812 (Fla. 4th

DCA 2017). The Fourth District concluded that "the evidence was insufficient as a

matter of law to show that the insurer acted in bad faith," and, "even if the

insurer's conduct were deficient, the insurer's actions did not cause the excess judgment." *Id.* We have jurisdiction based on the Fourth District's misapplication of our bad faith precedent as set forth in *Boston Old Colony Insurance Co. v. Gutierrez*, 386 So. 2d 783 (Fla. 1980), and, more recently, in *Berges v. Infinity Insurance Co.*, 896 So. 2d 665 (Fla. 2004).[1]

For the reasons that follow, we conclude that the Fourth District erred in holding that the evidence was insufficient to show that the insurer acted in bad faith in failing to settle the insured's claim. In reaching this erroneous conclusion, the Fourth District failed to properly apply the directed verdict standard and misapplied this Court's precedent in *Boston Old Colony* and *Berges*, where we set forth the fiduciary duties of insurance companies toward their insureds. We also conclude that the Fourth District misapplied our precedent when it stated that an insurer cannot be liable for bad faith "where the *insured's own actions or inactions* . . . at least in part" caused the excess judgment. *Harvey*, 208 So. 3d at 816. Not only did the Fourth District misapply our well-established bad faith precedent but it relied, in part, on nonbinding federal cases that cannot be reconciled with our

_____

1. We have jurisdiction. *See* art. V, § 3(b)(3), Fla. Const.; *see also Cortez v. Palace Resorts, Inc.*, 123 So. 3d 1085, 1087 (Fla. 2013) (stating that this Court's conflict jurisdiction was properly invoked by the district court's misapplication of a decision of this Court).

clear precedent. Accordingly, we quash the Fourth District's decision and remand with instructions to reinstate the final judgment.

## FACTS AND PROCEDURAL HISTORY

### The Underlying Accident

On August 8, 2006, Petitioner James Harvey, the insured, was involved in an automobile accident with John Potts. Potts, who was 51 years old at the time of the accident, died from injuries sustained in the crash, leaving behind a wife and three children. Harvey's vehicle was registered in both his name and his business's name, and was covered under a $100,000 liability policy. The accident was reported to his insurer, Respondent GEICO, and the claim was assigned to Fran Korkus, a claims adjuster.

### The Claims Process

Two days after the accident, on August 10, GEICO resolved the liability issue adversely to Harvey. GEICO was aware that there was significant financial exposure to Harvey because Potts had died leaving multiple survivors and Harvey's insurance coverage was only $100,000. On August 11, Korkus sent Harvey a letter explaining that Potts' claim could exceed his policy limits and that he had the right to hire his own attorney.

Vivian Tejeda, a paralegal employed by the attorney representing Potts' estate, called Korkus on August 14 and requested a statement from Harvey. Tejeda

explained that a recorded statement from Harvey was necessary to determine the extent of his assets, whether he had any additional insurance, and if he was in the course and scope of his employment at the time of the accident. Significantly, Korkus did not immediately communicate the request to Harvey, and, according to Tejeda, Korkus denied the request.

Three days later, GEICO tendered the full amount of the policy limits to the estate's attorney, Sean Domnick, along with a release and affidavit of coverage. In response, Domnick wrote a letter to Korkus, acknowledging receipt of the check and Korkus's refusal to make Harvey available for a statement. Korkus received this letter on August 31 and faxed it to Harvey, who learned for the first time that a statement had been requested.

That same day, Korkus contacted Domnick regarding the requested statement. After the conversation, Domnick faxed a letter confirming the scope of the conversation:

> This confirms our conversation in which you told me that you had received our recent letter regarding this matter. *You asked me why we wanted a statement from Mr. Harvey. I told you that it was for the same reason that Ms. Tejeda outlined previously as well as that referenced in my recent letter.* We want to determine what other coverage or assets may be available to cover this incident. You were unable to confirm that he would be available for a statement.

(Emphasis added.) Korkus did not respond to the letter.

The next day, September 1, Harvey called Korkus to discuss Domnick's letter. Harvey told Korkus that he planned to meet with his attorney, whom he had hired at Korkus's suggestion, to review his financial documents and provide the information requested, but advised Korkus that his attorney would not be available until September 5. Korkus documented the call in the following activity log entry:

> Received call from insured. He received the fax. Said his company attorney Pat Geraghty is not available until Tuesday after the holiday weekend. *Insured does not want claimant attorney to think we are not acting fast enough and asked what we can do to let the claimant's attorney know we are working on this.* I told insured that we will discuss letter with management and get back to him. Insured requested I fax him a copy of any response before it's sent.

(Emphasis added.) Korkus's supervisor specifically instructed Korkus to relay Harvey's message to Domnick. Korkus did not.

On September 13, 2006, approximately one month after Tejeda's initial request for a statement, the estate returned GEICO's check and filed a wrongful death suit against Harvey. The wrongful death action was tried before a jury that found Harvey 100% at fault and awarded the estate $8.47 million in damages. A judgment in favor of the estate was entered against Harvey for the full amount of damages.

**Harvey's Bad Faith Action**

Harvey filed a bad faith claim against GEICO based on the judgment that exceeded his policy limits of $100,000. At the trial on Harvey's bad faith claim,

- 5 -

Domnick, the lawyer for the estate, testified that he did not receive any communication from GEICO following his August 31 letter. He also testified that had he known that Harvey's only other asset was a business account worth approximately $85,000, he would not have filed suit and would have instead advised the estate to accept the policy limits. Korkus, the insurance adjuster, conceded during her testimony that it was reasonable for Domnick to request information about whether Harvey had other insurance coverage and the extent of his assets, testifying that plaintiff's attorneys asked for that information "all the time." GEICO's expert, John Atkinson, also testified that Domnick needed that information to properly advise the estate regarding settlement. Tracey Potts, wife of the decedent, testified that if Domnick had recommended that she settle, she would have followed his advice and accepted the policy limits offered by GEICO.

Daniel Doucette, an expert in bad faith, testified that a serious claim such as this one would require "a sense of urgency" on behalf of the insurer. He stated that it would have been in Harvey's best interests for Korkus to inform Domnick that he had retained an attorney, as this would have facilitated the recorded statement. Doucette also explained that because GEICO was handling the claim, Harvey could not contact Domnick directly. Instead, Harvey had to use Korkus as "a go-between given his duty to cooperate with his insurer."

In addition to this expert testimony, Harvey presented evidence which showed that Korkus had a history of struggling to manage her files. At the time of Harvey's claim, Korkus was handling approximately 130 claims. Her personnel file showed that she had trouble managing her claims properly, which included communication failures. In a performance appraisal from 2005, a year before Harvey's accident, a performance review indicated that "[her] productivity numbers fell below average . . . there is now exposure to our insured and to GEICO for extra contractual damage . . . [and she] could use help with her organizational skills, filtering her emails, along with organizing her desk." A year later, another performance review stated that Korkus "has struggled throughout the year with desk management, which is magnified in her low file quality rating."

At the conclusion of Harvey's case, GEICO moved for directed verdict, which the trial court denied. In a special verdict, the jury found that GEICO acted in bad faith and the trial court entered judgment in favor of Harvey in the amount of $9.2 million. GEICO's motion for a judgment notwithstanding the verdict was denied.

GEICO appealed, arguing that Harvey "offered insufficient evidence at trial to support his bad faith claim." *Harvey*, 208 So. 3d at 814. The Fourth District agreed and reversed, concluding that "the evidence was insufficient as a matter of law to show [GEICO] acted in bad faith" in failing to settle the claim against

Harvey. *Id.* at 816. The Fourth District further concluded that "even if the insurer's conduct were deficient, the insurer's actions did not cause the excess judgment rendered against the insured." *Id.* at 812.

## ANALYSIS

Harvey argues that the Fourth District's decision was erroneous for two reasons. First, Harvey asserts that the Fourth District erred in granting a directed verdict in favor of GEICO on his bad faith claim because he presented sufficient evidence to support his claim. Second, Harvey contends that the Fourth District erred in concluding that an insurer cannot be found liable when the insured's own conduct "at least in part," results in an excess judgment. *Id.* at 816. Because this case involves an order entered on a motion for directed verdict our review is de novo. *Christensen v. Bowen*, 140 So. 3d 498, 501 (Fla. 2014). "When reviewing a trial court's ruling on a motion for directed verdict, this Court views the evidence and all inferences of fact in the light most favorable to the nonmoving party." *Id.*

We begin by explaining the bad faith law of this state, as set forth by this Court first in *Boston Old Colony*, and more recently in *Berges*. We then turn to this case, where we first address the Fourth District's conclusion that the evidence is insufficient to support the jury's finding that GEICO acted in bad faith in failing to settle the estate's claim against Harvey. We then address the Fourth District's

- 8 -

conclusion that an insurer cannot be found liable for bad faith where the excess judgment was caused in part by the insured.

## I. Bad Faith

We have explained that "[b]ad faith law was designed to protect insureds who have paid their premiums and who have fulfilled their contractual obligations by cooperating fully with the insurer in the resolution of claims." *Berges*, 896 So. 2d at 682. Thus, "[b]ad faith jurisprudence merely holds insurers accountable for failing to fulfill their obligations, and our decision does not change this basic premise." *Id.* at 683.

Almost four decades ago, we explained the law of bad faith and the good faith duty insurers owe to their insureds in handling their claims, which still holds true today. *See Boston Old Colony*, 386 So. 2d at 785. We explained that "in handling the defense of claims against its insured," the insurer "has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Id.* This duty arises from the nature of the insurer's role in handling the claim on the insured's behalf— because the insured "has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, then the insurer must assume a duty to exercise such control and make such decisions in

good faith and with due regard for the interests of the insured." *Id.* We explained in great detail what this duty requires of insurers:

> This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so. Because the duty of good faith involves diligence and care in the investigation and evaluation of the claim against the insured, negligence is relevant to the question of good faith.

*Id.* (citations omitted).

We reaffirmed this duty insurers owe to their insureds in *Berges*, stating that the insurer "owe[s] a fiduciary duty to act in [the insured's] best interests." 896 So. 2d at 677. Indeed, "this is what the insured expects when paying premiums." *Id.* at 683.

The obligations set forth in *Boston Old Colony* are not a mere checklist. An insurer is not absolved of liability simply because it advises its insured of settlement opportunities, the probable outcome of the litigation, and the possibility of an excess judgment. Rather, the critical inquiry in a bad faith is whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment.

- 10 -

"[T]he question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the 'totality of the circumstances' standard." *Id.* at 680. Further, it is for the jury to decide whether the insurer failed to "act in good faith with due regard for the interests of the insured." *Boston Old Colony*, 386 So. 2d at 785. This Court will not reverse a jury's finding of bad faith where it is supported by competent, substantial evidence, as "it is not the function of [the appellate court] to substitute its judgment for the trier of fact." *Berges*, 896 So. 2d at 680.

In a case "[w]here liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. 3d DCA 1991). In such a case, where "[t]he financial exposure to [the insured] [i]s a ticking financial time bomb" and "[s]uit c[an] be filed at any time," any "delay in making an offer under the circumstances of this case even where there was no assurance that the claim could be settled could be viewed by a fact finder as evidence of bad faith." *Goheagan v. Am. Vehicle Ins. Co.*, 107 So. 3d 433, 439 (Fla. 4th DCA 2012) (citing *Boston Old Colony*, 386 So. 2d at 785).

The damages claimed by an insured in a bad faith case "must be caused by the insurer's bad faith." *Perera v. U.S. Fidelity & Guar. Co.*, 35 So. 3d 893, 902 (Fla. 2010). However, "the focus in a bad faith case is not on the actions of the

claimant but rather on those of the insurer in fulfilling its obligations to the insured." *Berges*, 896 So. 2d at 677.

Federal case law interpreting our bad faith precedent does not always hit the mark. For example, in this case, the Fourth District relied in part on *Novoa v. GEICO Indemnity Co.*, 542 F. App'x 794 (11th Cir. 2013), which was not selected for publication in the Federal Reporter. In that case, the Eleventh Circuit Court of Appeals stated that "[t]o fulfill the duty of good faith, an insurer does not have to act perfectly, prudently, or even reasonably. Rather, insurers must 'refrain from acting solely on the basis of their own interests in settlement.' " *Id.* at 796 (quoting *State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So. 2d 55, 58 (Fla. 1995)). Though the Eleventh Circuit cherry-picked a single clause from this Court's opinion *Laforet* in which we addressed the narrow issue of the validity "of retroactively applying a penalty to insurance companies for bad faith conduct in failing to settle uninsured motorist claims," 658 So. 2d at 56, it failed to consider our opinion in *Boston Old Colony*, where we made clear that there is far more to the bad faith inquiry than whether the insurer acted in its own interest.

Indeed, in *Boston Old Colony*, we stated in no uncertain terms that an insurer "has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." 386 So. 2d at 785. We explained that this duty obligated an insurer "to

exercise such control" over the handling of the claim "and make such decisions in good faith and with due regard for the interests of the insured." *Id.* Additionally, not only is an insurer required to refrain from acting in its own interests in handling the claim, but it must also act with "care and diligence." *Id.* Thus, the Eleventh Circuit's contention that an insurer need not act prudently or even reasonably also misconstrues our well-established bad faith precedent.

As we discuss below, the Fourth District went astray, in part, by relying on this federal case, in lieu of this Court's precedent, to reverse the judgment entered in favor of Harvey. We now turn to this case.

## II. This Case

Under the totality of the circumstances, we conclude that there was competent, substantial evidence to support the jury's finding that GEICO acted in bad faith in failing to settle the estate's claim against Harvey. In concluding otherwise, the Fourth District (1) failed to properly apply the directed verdict standard; and (2) misapplied this Court's precedent in *Boston Old Colony* and *Berges*. We also conclude that the Fourth District misstated the law when it stated that an insurer cannot be liable for bad faith "where the *insured's own actions or inactions* result, at least in part, in an excess judgment." *Harvey*, 208 So. 3d at 816. Nothing in our precedent can be read to suggest that an insurer cannot be found liable for bad faith merely because the insured could have attempted on his

own to avoid the excess judgment. In fact, our precedent states just the opposite, as it is the insurer who owes a fiduciary obligation to the insured "to exercise such control and make such decisions in good faith and with due regard for the interests of the insured." *Boston Old Colony*, 386 So. 2d at 785.

We first address the sufficiency of the evidence supporting the jury's finding of bad faith.

### A. Sufficiency of the Evidence

In a bad faith case, the evidence must be viewed in the context of the circumstances of each particular case. *See Berges*, 896 So. 2d at 680 (stating that each bad faith case "is determined on its own facts"). In this case, viewing the evidence in the light most favorable to Harvey, GEICO's independent investigation of the facts revealed, within days after the accident, that this was a case of clear liability and substantial damages, and a jury verdict could exceed the insured's $100,000 policy limit. Not only did GEICO know that Harvey was at fault for the accident, but it knew that John Potts, a husband and father of three children, died as a result. In other words, this was a case of catastrophic damages.

As the evidence reveals, however, GEICO failed to act as if the financial exposure to Harvey was a "ticking financial time bomb." *Goheagan*, 107 So. 3d at 439. The evidence shows that GEICO completely dropped the ball and failed to fulfill its obligation to Harvey to "use the same degree of care and diligence as a

person of ordinary care and prudence should exercise in the management of his own business." *Boston Old Colony*, 386 So. 2d at 785. Instead of doing everything possible to facilitate settlement negotiations, GEICO'S claims adjuster, Korkus, was a considerable impediment to both Harvey and the estate. When Domnick, the estate's attorney, requested a statement from Harvey, Korkus refused the request, despite acknowledging that such statements were standard practice. Additionally, not only did Korkus refuse the request, but she did not inform Harvey of the request until two weeks later, when Korkus received a letter from Domnick stating that the request had been denied. Even when Harvey informed Korkus that he intended to meet with his attorney to compile the information necessary for the statement, Korkus did not relay this information to Domnick. In fact, Korkus wholly failed to communicate with Domnick at all after receiving his letter.

The significance of Korkus's failure to inform the estate that Harvey intended to provide a statement cannot be overstated, as Domnick testified that had he known that Harvey planned to give a statement, "he would have recommended delaying the filing of the wrongful death suit." *Harvey*, 208 So. 3d at 813. Further, the estate's personal representative testified that "she would have followed her attorney's advice and would have declined to file the lawsuit." *Id.* at 813-14. Thus, had GEICO acted "with due regard" for Harvey's interests, the excess

judgment could have been prevented. *Boston Old Colony*, 386 So. 2d at 785. There can be no doubt that had GEICO been faced with paying the entire multi-million-dollar judgment returned by the jury in this case, an amount that was completely foreseeable given the clear liability and catastrophic damages, it would have done everything possible to comply with the estate's reasonable demands.

Accordingly, we conclude that there was competent, substantial evidence to support the jury's finding that GEICO acted in bad faith in failing to settle the estate's claim against Harvey. In concluding otherwise, the Fourth District failed to properly apply the directed verdict standard that all evidence be viewed in the light most favorable to Harvey, as the nonmoving party.

In addition to the Fourth District's failure to properly apply the directed verdict standard, it relied on a nonbinding decision of the Eleventh Circuit Court of Appeals, which cannot be reconciled with this Court's bad faith jurisprudence. *See Novoa*, 542 F. App'x 794. As a result, the Fourth District misapplied this Court's precedent in *Boston Old Colony* and *Berges*.

Relying on the Eleventh Circuit's opinion in *Novoa*, the Fourth District acknowledged that "GEICO could have acted more efficiently in handling the insured's claim." *Harvey*, 208 So. 3d at 816. The Fourth District concluded, however, that the evidence "merely show[ed] that GEICO could have perhaps 'improved its claims process,' not that it acted in bad faith." *Id.* (quoting *Novoa*,

- 16 -

542 F. App'x at 796).  The Fourth District stated further that, "even if GEICO's actions were negligent, negligence alone is insufficient to prove bad faith."  *Id.* While it is true that negligence is not the standard, we made clear in *Boston Old Colony* that "[b]ecause the duty of good faith involves diligence and care in the investigation and evaluation of the claim against the insured, *negligence is relevant to the question of good faith.*"  386 So. 2d at 785 (emphasis added).  By relying on this opinion from the Eleventh Circuit in lieu of this Court's binding precedent in *Boston Old Colony*, the Fourth District minimized the seriousness of the insurer's duty to act in good faith with due regard for the interests of its insured.[2]

Instead of taking seriously what the duty of good faith requires of insurers as set forth in *Boston Old Colony*, the Fourth District appeared to treat the obligations an insurer owes to its insured as a checklist; so long as a checkmark appeared next to each item, bad faith may not be found.  Indeed, the Fourth District noted that GEICO notified Harvey of settlement opportunities, advised him of the possibility of an excess judgment, and recommended that he retain his own attorney.  *Harvey*,

_____

2. Regarding the Fourth District's reliance on federal case law, it has been observed that the "[t]o the extent that the federal cases permit summary judgment based on Federal Rule of Civil Procedure 56 . . . they are of limited precedential value in Florida summary judgment cases" because Florida places a higher burden on a party moving for summary judgment in state court.  *Byrd v. BT Foods, Inc.*, 948 So. 2d 921, 923-24 (Fla. 4th DCA 2007).

208 So. 3d at 815. Thus, the Fourth District concluded that GEICO "fulfilled every obligation" it owed Harvey. *Id.*

Significantly absent from the Fourth District's analysis, however, is whether GEICO "use[d] the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Boston Old Colony*, 386 So. 2d at 785. Indeed, had the Fourth District conducted a careful analysis of this question, it would not have concluded as a matter of law that GEICO acted "in good faith with due regard for the interests" of Harvey when Korkus failed to inform the estate's attorney that Harvey was working on a financial statement even after both Harvey and Korkus's supervisor specifically asked Korkus to do so. *Id.*

In addition to concluding that GEICO fulfilled its obligations to Harvey, the Fourth District also found significant that GEICO "tendered the policy limits, unconditionally, nine days after the accident." *Harvey*, 208 So. 3d at 816. Indeed, when considering the circumstances in this case, offering the $100,000 policy limits when GEICO knew that the estate demanded a statement from Harvey as to any additional assets that he might own was not only perfectly reasonable but critical to a prompt resolution. However, nothing in either *Boston Old Colony* or *Berges* can be read to suggest that an insurer's obligations end by tendering the policy limits. To the contrary, the insurer's duty to act in good faith "in handling

- 18 -

the defense of claims against its insured" continues through the duration of the claims process. *Boston Old Colony*, 386 So. 2d at 785.

The Fourth District further misapplied our precedent when it blamed Harvey for the estate's decision to return GEICO's check and file suit, reasoning that Harvey "never provided a statement to the estate despite having the assistance of legal counsel for several days before suit was eventually filed." *Harvey*, 208 So. 3d at 816. As we stated in *Berges*, "the focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." 896 So. 2d at 677. This is because, as the insured, Harvey "surrendered to the insurer all control over the handling of the claim." *Boston Old Colony*, 386 So. 2d at 785. Indeed, as Harvey's bad faith expert testified, because GEICO was handling the claim, Harvey could not contact the estate's attorney directly, but had to use Korkus as "a go-between." The Fourth District, thus, misapplied our precedent when it blamed Harvey for failing to do more to avoid the excess judgment.

In concluding the evidence was insufficient to show that GEICO acted in bad faith in failing to settle the estate's claim against Harvey, the Fourth District did not properly apply the directed verdict standard and misapplied this Court's well-established bad faith precedent by relying on erroneous federal precedent. Had the Fourth District properly applied the directed verdict standard and faithfully

- 19 -

adhered to this Court's precedent, the only result would have been to uphold the jury's verdict for Harvey, because the totality of the circumstances support the jury's finding that GEICO acted in bad faith in handling the defense of claims against Harvey.

We now turn to the Fourth District's statement that an insurer cannot be found liable for bad faith where the excess judgment was caused in part by the insured.

## B. Causation

In the decision below, the Fourth District stated that "where the *insured's own actions or inactions* result, at least in part, in an excess judgment, the insurer cannot be liable for bad faith." *Harvey*, 208 So. 3d at 816. We conclude that this statement misapplies our precedent in *Berges*, where we stated that "the focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." *Berges*, 896 So. 2d at 677.

After holding that the evidence was insufficient to show that GEICO acted in bad faith, the Fourth District went on to conclude the that "[e]ven assuming that GEICO handled [Harvey's] claim improperly, [Harvey] failed to establish that GEICO's conduct caused the excess judgment." *Harvey*, 208 So. 3d at 816. In reaching this conclusion, the Fourth District, again relying on federal cases, stated that "where the *insured's own actions or inactions* result, at least in part, in an

excess judgment, the insurer cannot be liable for bad faith." *Id.* (citing *Barnard v. GEICO Gen. Ins. Co.*, 448 F. App'x 940, 944 (11th Cir. 2011); *Novoa*, 542 F. App'x at 796-97). This statement is fundamentally inconsistent with this Court's precedent, which could not be clearer in stating that "the focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." *Berges*, 896 So. 2d at 677.

While this Court has stated that "there must be a causal connection between the damages claimed and the insurer's bad faith," *Perera*, 35 So. 3d at 902, this Court has never held or even suggested that an insured's actions can let the insurer off the hook when the evidence clearly establishes that the insurer acted in bad faith in handling the insured's claim. In fact, the standard jury instructions on legal cause in a bad faith case belies the Fourth District's conclusion that where the insured's own actions, even "in part" cause the judgment, the insurer cannot be found liable for bad faith. Indeed, the standard legal cause instruction states:

> Bad faith conduct is a legal cause of [loss] [damage] [or] [harm] if it directly and in natural and continuous sequence produces or contributes substantially to producing such [loss] [damage] [or] [harm], so that it can reasonably be said that, but for the bad faith conduct, the [loss] [damage] [or] [harm]would not have occurred.

Fla. Std. Jury Instr. (Civ.) 404.6(a).  Nowhere in this instruction does it state that an insurer can escape liability merely because the insured's actions could have contributed to the excess judgment.[3]

To take the Fourth District's reasoning to its logical conclusion, an insurer could argue that regardless of what evidence may be presented in support of the insured's bad faith claim against the insurer, so long as the insurer can put forth any evidence that the insured acted imperfectly during the claims process, the insurer could be absolved of bad faith.  As Harvey argues, this would essentially create a contributory negligence defense for insurers in bad faith cases where concurring and intervening causes are not at issue.  We decline to create such a defense that is so inconsistent with our well-established bad faith jurisprudence

---

3.  In this case, Harvey argued in favor of including the standard legal cause instruction in the jury's instructions.  However, GEICO argued against its inclusion, explaining that it was simply arguing that "it did not act in bad faith because the case could not have been settled.  Acting fairly and honestly, we did everything we could and we acted in good faith."  Accordingly, the only substantive instruction on bad faith law given to the jury was:

> Bad faith on the part of an insurance company is failing to settle a claim when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for his interests.

The Legal Cause Standard Jury Instruction includes additional optional instructions on concurring cause and intervening cause.  Fla. Std. Jury Instr. (Civ.) 404.6(b)-(c).  However, GEICO specifically requested that those instructions, also, not be given to the jury in this case.

which places the focus on the actions on the insurer—not the insured. *Berges*, 896 So. 2d at 677.

## CONCLUSION

An insured pays its insurance premiums with the expectation that the insurer will "act in good faith in the investigation, handling, and settling of claims brought against the insured." *Berges*, 896 So. 2d at 683. In this case, a jury found that GEICO acted in bad faith by failing to settle the estate's claim against Harvey. Substituting its own judgment for that of the jury, the Fourth District erroneously concluded that the evidence was insufficient to show that GEICO acted in bad faith and that, even if it did, GEICO's actions did not cause the excess judgment against Harvey.

In reaching these erroneous conclusions, the Fourth District failed to properly apply the directed verdict standard and misapplied this Court's well-established bad faith precedent. For all the reasons stated, we quash the Fourth District's decision, and direct that on remand, the jury verdict and final judgment be reinstated.

It is so ordered.

PARIENTE, LEWIS, and LABARGA, JJ., concur.
CANADY, C.J., dissents with an opinion, in which POLSTON and LAWSON, JJ., concur.
POLSTON, J., dissents with an opinion, in which CANADY, C.J., and LAWSON, J., concur.

- 23 -

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

CANADY, C.J., dissenting.

The Fourth District's decision in *GEICO General Insurance Co. v. Harvey*, 208 So. 3d 810 (Fla. 4th DCA 2017), does not expressly and directly conflict with this Court's decisions in *Boston Old Colony Insurance Co. v. Gutierrez*, 386 So. 2d 783 (Fla. 1980), or *Berges v. Infinity Insurance Co.*, 896 So. 2d 665 (Fla. 2004), "on the same question of law." Art. V, § 3(b)(3), Fla. Const. Because this Court lacks jurisdiction, I dissent from the majority's failure to discharge this case.

Indeed, the only conflict here is between the majority's decision and the prior precedents of this Court. Under a proper reading of *Boston Old Colony* and *Berges*, the Fourth District's decision should be approved. The evidence here, when viewed in the light most favorable to the insured, James Harvey, is legally insufficient to support a verdict against Harvey's automobile insurer, GEICO, for bad faith failure to settle the third party's claim within Harvey's $100,000 policy limits. GEICO—who tendered the policy limits within days of the fatal accident and stood ready and willing to settle—should not be liable for the $8,470,000 of damages caused by Harvey. In reinstating this punitive, extracontractual award, the majority mischaracterizes certain relevant facts, relies on certain unsupported assumptions, and misreads our case law as standing for the proposition that an insured's own actions are irrelevant in any bad faith action.

- 24 -

The majority paints the picture that Harvey only had $85,000 of assets, that he agreed to provide his financial information to the estate's attorney, and that the wrongful death suit against Harvey would have settled for the $100,000 policy limits if only GEICO had informed the estate's attorney that Harvey was working on providing the information. The record reveals that Harvey and his wife had assets well in excess of $1 million, Harvey was already discussing his coverage and assets with potential legal counsel on the day of the accident, Harvey provided his asset information to his personal attorney *three weeks* before suit was filed, Harvey and his attorney knew of the estate's attorney's request for information, and Harvey never once offered to provide the information. It is not that the Fourth District erroneously "blamed Harvey for failing to do more to avoid the excess judgment." Majority op. at 19. Rather, it is that Harvey and his attorney—not GEICO—controlled the only relevant decision that needed to be made.

Although GEICO's claims agent handled the claim less than perfectly, negligent claims handling does not equate to bad faith. *Campbell v. Gov't Employees Ins. Co.*, 306 So. 2d 525, 530 (Fla. 1974). The majority's decision to reinstate the jury verdict muddies the waters between negligence and bad faith and bolsters "contrived bad faith claims." *Berges*, 896 So. 2d at 686 (Wells, J., dissenting). Indeed, the estate's attorney was permitted to testify that GEICO was in bad faith a mere six days after the accident. I thus echo Justice Wells'

- 25 -

dissenting view in *Berges* that it is not "acceptable for the Court to merely say that bad faith is a jury question." *Id.* This Court should set forth "logical, objective" rules for bad faith. *Id.* And it should not sanction the award of "limitless insurance," *id.*, in a case in which the insurer tendered the policy limits, the third party never made any time-limited demand or presented any settlement offer of its own, and the only relevant decision to be made was within the insured's control.

## I. Jurisdiction

The majority's determination of jurisdiction appears to be based on the conclusion that *Harvey* misapplied *Boston Old Colony* as merely setting forth a bad faith "checklist," majority op. at 17, and that *Harvey* misapplied *Berges* by considering Harvey's "*own actions or inactions*," majority op. at 2 (quoting *Harvey*, 208 So. 3d at 816). But the majority's finding of misapplication conflict is grounded in the majority's misreading of our case law.

### *Boston Old Colony*

In *Boston Old Colony*, the injured third party sued the insured's automobile insurer for bad faith failure to settle the third party's claim within the insured's $10,000 policy limits. *Boston Old Colony*, 386 So. 2d at 784-85. Of relevance, the investigating officer concluded that the insured caused the collision, the third party's injuries "were extensive," the third party actually offered to settle for the insured's $10,000 policy limits, and the insurance company recommended that the

insured settle the case, but the insured requested that the insurance company not settle due to the insured's pending counterclaim. *Id.* at 784. The insurance company ultimately chose to not settle and went so far as to obtain a "hold harmless" agreement from the insured. *Id.* After the parties settled the insured's counterclaim, the insurance company offered the $10,000 policy limits in settlement of the third party's claim, but the third party opted to proceed to trial and obtained a judgment against the insured in the amount of $1,400,000. *Id.* The third party then sued the insurance company for bad faith, alleging failure to settle "when [the insurance company] had the opportunity." *Id.* at 784-85. The third party prevailed in a jury trial and obtained a judgment against the insurance company in the amount of $1,400,000. *Id.* at 785.

On appeal, the insurance company argued that the trial court erred in denying its motion for directed verdict. The Third District rejected that argument, "holding that there was sufficient evidence upon which a jury could base a verdict of bad faith failure to settle." *Id.*

On review, this Court quashed the Third District's decision. *Id.* at 786. Despite noting that the question of bad faith "is for the jury," this Court concluded that no "reasonable jury" could have reached a verdict of bad faith failure to settle. *Id.* at 785. In doing so, this Court described the insurer's duty of good faith in

general terms before laying out certain specific obligations an insurer is required to fulfill in the context of injuries caused by its insured to a third party:

> This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.

*Id.* (citation omitted). This Court then concluded that the evidence demonstrated that the insurance company "fulfilled all these obligations." *Id.*

In justifying its decision, this Court specifically noted the relevance of the insured's own actions. *Id.* at 785-86. The Court recounted that the insured "at all times contested liability," requested the insurer "not to settle the claim because he was pursuing a counterclaim against [the] plaintiff," and "executed a 'hold harmless' agreement . . . assum[ing] responsibility for any excess judgment." *Id.* This Court did so despite earlier explaining that the insurance company has "all control over the handling of the claim, including all decisions with regard to litigation and settlement," and that the insurance company has a duty to "settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so." *Id.* at 785. This Court ultimately determined that the failure to settle was "because of the explicit request of its own insured." *Id.* at 786. This Court also noted the relevance of the third party's own actions, namely the

- 28 -

third party's "refus[al] to settle when the insurer subsequently offered to settle prior to trial." *Id.*

*Harvey* does not expressly and directly conflict with *Boston Old Colony* on any question of law. *Harvey* recognized the controlling relevance of *Boston Old Colony*, examined the facts in light of the obligations set forth in *Boston Old Colony*, and concluded that, even though GEICO could have handled the claim better, the evidence showed that GEICO fulfilled the *Boston Old Colony* obligations. *Harvey*, 208 So. 3d at 814-15. In *Boston Old Colony*, we held that the insurer's motion for directed verdict should have been granted because the evidence showed that the insurer "fulfilled all these obligations" and stood "ready" and "willing[] to settle" for the policy limits. *Boston Old Colony*, 386 So. 2d at 785-86. The district court in *Harvey* reached the very same conclusion.

### *Berges*

The majority's asserted basis for misapplication conflict with *Berges* rests squarely on the majority's disagreement with the Fourth District's decision to consider Harvey's own actions. Even assuming that the complained-of analysis in *Harvey* is not dicta, there is no express and direct conflict.

The majority repeatedly cites the following language from *Berges*: "the focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." *E.g.*, majority op. at 21

(quoting *Berges*, 896 So. 2d at 677). The majority interprets this language as standing for the proposition that the *sole* focus in any action for bad faith failure to settle must be on the insurer's actions—to the exclusion of all else. But the majority overlooks that *Berges* cited *Boston Old Colony* as support for that very language. *See Berges*, 896 So. 2d at 677. As just explained, *Boston Old Colony* itself specifically noted the relevance of the insured's own actions, as well as those of the third-party claimant. *Boston Old Colony*, 386 So. 2d at 785-86. And the *Berges* Court emphasized that it was not departing from *Boston Old Colony*: "we have not attempted to alter bad faith jurisprudence." *Berges*, 896 So. 2d at 682. *Harvey* thus stayed well within the bounds of our precedent by focusing on GEICO's conduct while also considering, for example, that "the estate never provided any deadline or other timeframe within which th[e] statement was to be provided," or that "despite the insured knowing the estate wanted a statement, neither the insured nor his attorney took any further action to provide the estate with a statement." *Harvey*, 208 So. 3d at 813.

## II. The Majority's Substantive Decision

The result of the majority's decision is that an insured who caused damages that exceeded his policy limits by over 8,000 percent, who had assets that greatly exceeded his policy limits, and who at no time ever offered to provide his financial information to the third-party claimant despite knowing that the information was

- 30 -

being requested even after the policy limits were tendered, has his $100,000 policy converted into an $8.47 million policy, while other insurance customers eventually foot the bill. Our case law does not support this result.

Because the majority asserts that the Fourth District failed to view the evidence in the light most favorable to Harvey, *see* majority op. at 16, and because the majority glosses over critical aspects of the record, I first review the timeline of events. Ultimately, the only disputed events of any potential relevance occurred on two days—August 14 and 31, 2006. But even viewing those events in the light most favorable to Harvey, GEICO should be entitled to judgment as a matter of law.

### The Proceedings Below

On August 8, 2006, James Harvey, who was insured by GEICO for $100,000 and whose vehicle was registered in his name and his business's name, caused the accident that resulted in the death of John Potts. GEICO's adjuster, Fran Korkus, promptly interviewed Harvey. On this same day, Harvey called a local attorney and discussed his insurance coverage and assets.[4] Although Harvey did not hire this attorney, Harvey was obviously concerned about his exposure to a lawsuit. After all, he and his wife had well over $1 million in assets.

---

4. It appears that the local attorney with whom Harvey spoke worked for the same law firm that Mrs. Potts ended up hiring in the suit brought against Harvey.

On August 11, Korkus spoke with Harvey and sent him a letter explaining his policy limits, advising him of the possibility of excess exposure, and advising him of his right to retain his own attorney to protect his rights regarding excess exposure. Later this same day, Harvey retained a personal attorney—the attorney for Harvey's business.

On August 14, Vivian Tejada, a paralegal for the law firm retained by Mrs. Potts, called Korkus. Korkus's notes reveal that Tejada advised Korkus of the law firm's involvement in the case and that a letter of representation would be forthcoming. The remaining events surrounding this call are in dispute. Viewing the disputed facts in the light most favorable to Harvey, it should be assumed that Korkus declined "at this time" Tejada's request to make Harvey available for a statement that would include his asset information. However, it is also undisputed that Tejada never gave a deadline or informed Korkus that the statement was a prerequisite to settling the claim.

Within one hour of her call with Tejada, Korkus called Harvey. Korkus's contemporaneous notes indicate that she "updated [Harvey] on claim status" and informed him about the specific law firm retained by Mrs. Potts. The remaining events surrounding this call are in dispute. Accepting Harvey's "best of my recollection" testimony, it should be assumed that Korkus did not mention that Tejada had asked about other insurance coverage and Harvey's assets.

Three days later, on August 17, it is undisputed that Harvey gathered all of his asset information and set up a meeting with his attorney to take place on August 23 in Fort Myers. Interestingly, when asked at trial about the stack of documents related to his finances that he provided to his attorney, Harvey explained: "I had collected up anything that I thought might be relevant to any question that might be asked and *having no idea what is meant by a statement, nor what was being asked for* or anything else, decided that it's much better to provide more information than less information." (Emphasis added.) Harvey later testified that GEICO's August 11 excess-exposure letter was the sole reason why he set up the meeting with his attorney. In any event, Harvey's actions leave little doubt that he remained worried about his financial exposure.

Also on August 17, GEICO unconditionally tendered the $100,000 policy limits, along with an affidavit of coverage and a proposed release. GEICO's activity log contains multiple entries indicating that GEICO had to first contact the estate's law firm because the law firm had not yet provided GEICO with a letter of representation confirming the law firm's involvement in the case.

On August 23, Harvey took his financial information and met with his attorney. Testimony revealed that Harvey owned certain liquid assets exceeding $900,000, plus four motor vehicles and two houses. The estate's attorney testified that in his view, the only asset available to the estate as "collectible" was $85,000

in the operating account of Harvey's business. The estate's attorney also testified that he would have recommended settling the case for the $100,000 policy limits had Harvey's asset information been provided, and Mrs. Potts testified that she would have deferred to the estate's attorney.

On August 31, Korkus received a letter with the estate's attorney's response to GEICO's tender of policy limits. In this letter dated August 24, the estate's attorney stated that he "will discuss [GEICO's offer] with my client" while noting that Korkus had "declined" Tejada's "offer" on August 14 that Harvey be made available for a statement. Korkus forwarded a copy to Harvey, spoke with Harvey, and, at Harvey's request, forwarded a copy to Harvey's attorney. Korkus also forwarded a copy to Tim Holleran, a GEICO home office attorney. On Holleran's advice, Korkus contacted the estate's attorney to obtain more information regarding the requested statement. The events surrounding Korkus's call with the estate's attorney are also in dispute. Korkus's notes specifically reflect that she "advised [the estate's attorney] I will contact [Harvey]" and pass the information along "so he can decide." The estate's attorney testified that Korkus never indicated she was going to forward the information to Harvey.

Even accepting the estate's attorney's testimony over Korkus's specific and contemporaneous notes, it is undisputed that Korkus called Harvey shortly after she spoke with the estate's attorney. Korkus's notes from her call with Harvey

- 34 -

reflect that she "advised [Harvey] of my conversation [with the estate's attorney] & what info [the estate's attorney] wants to cover in a statement." Korkus also documented that Harvey was going to discuss the statement request with his personal attorney. The accuracy of Korkus's notes from her call with Harvey are not in dispute.

Later that same evening of August 31, the estate's attorney faxed a letter to Korkus memorializing their conversation from earlier in the day. In this second letter, he reiterated their interest in obtaining information from Harvey while noting that Korkus was "unable to confirm" Harvey's availability. Nothing in this letter suggests that Korkus refused to make Harvey available, that any time-limited demand was made, or that any conditions were imposed under which a settlement within the policy limits would be effectuated.

On Friday, September 1, Korkus discussed the second letter with Harvey and sent him a sample form for providing some of the requested information. Harvey informed Korkus that his attorney was not available until after the holiday weekend and that he wanted to speak to his attorney about whether to provide a statement. Harvey also expressed concern about the two letters and did not want the estate's attorney to think they were "not acting fast enough." Rather, he wanted the estate's attorney to know that they were "working on this." GEICO's home office attorney also recommended that Korkus follow up with the estate's

attorney regarding her conversation with Harvey. For unexplained reasons, Korkus did not do so.

On September 11, the estate's attorney discussed bad faith law with Mrs. Potts and recommended that she file suit against Harvey. Indeed, the estate's attorney later testified at the bad faith trial that GEICO was in bad faith on August 14—a mere six days after the accident. And yet on August 14, it appears the law firm had not even provided GEICO with a letter of representation.

Finally, on September 13, the wrongful death suit was filed against Harvey, eventually resulting in an $8.47 million judgment against him and leading to Harvey's suit against GEICO for bad faith failure to settle. During the bad faith trial, the jury heard that among other things: (1) Mr. Potts had been killed; (2) the estate obtained a judgment against Harvey for $8.47 million; (3) Harvey only had $100,000 of insurance coverage and purportedly only had collectible assets of $85,000; and (4) if a verdict of bad faith was rendered against GEICO, the $8.47 million judgment against Harvey would be satisfied, with all of the money going to the estate. It was also revealed that in the nine years from the day of the accident, Harvey had never once offered to provide a statement of his assets, and the estate had not attempted to collect a single penny from Harvey.

## The Law of Bad Faith

In the context of claims for third-party injuries caused by an insured, this Court in *Boston Old Colony* described an insurer's duty to its insured as a general "duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Boston Old Colony*, 386 So. 2d at 785. This Court then laid out certain specific obligations an insurer is required to fulfill:

> This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and *settle, if possible*, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.

*Id.* (emphasis added) (citation omitted). More recently, this Court in *Berges* described an insurer's duty to its insured as a "fiduciary obligation to protect its insured from a judgment exceeding the limits of the insurance policy." *Berges*, 896 So. 2d at 668. Although *Boston Old Colony* did not refer to such a "fiduciary obligation," *Berges* makes clear that it was attempting to follow the principles set forth in *Boston Old Colony* and was "not attempt[ing] to alter bad faith jurisprudence." *Id.* at 682. Thus, nothing in this Court's case law suggests that *Boston Old Colony* is no longer good law.

As explained above, *Boston Old Colony* concluded—as a matter of law—that the insurance company could not be liable for bad faith failure to settle, even though the insurance company refused an offer to settle for the insured's $10,000 policy limits, and the extensively injured third party later obtained a judgment against the insured for $1,400,000. *Boston Old Colony*, 386 So. 2d at 785. We did so because the insurance company "fulfilled all [of its] obligations" of investigating, advising, and warning, and was "ready" and "willing[] to settle" for the policy limits. *Id.* at 785-86. We also noted the relevance of the actions of both the insured and the third party. *Id.*

In a well-reasoned decision, the Fourth District in *Harvey* explained why GEICO satisfied all of its obligations under *Boston Old Colony* and should have similarly been entitled to a directed verdict. The majority here understandably does not take issue with the Fourth District's analysis of the specific *Boston Old Colony* obligations. Indeed, it cannot reasonably be said that GEICO failed to satisfy any of those obligations. GEICO "investigate[d] the facts," advised Harvey "as to the probable outcome of the litigation," warned Harvey "of the possibility of an excess judgment," and advised Harvey of "steps he might take to avoid same." *Boston Old Colony*, 386 So. 2d at 785. Those steps included advising Harvey of his right to retain a personal attorney to protect his rights regarding excess exposure and later advising Harvey that the estate was requesting a statement,

while explaining to Harvey what was being requested. The decision as to whether to provide the statement, of course, was Harvey's to make, not GEICO's. After all, an insurer has no duty to undertake a legal analysis of its insured's financial position. Finally, it cannot be said that GEICO failed "to initiate settlement negotiations" in this case "[w]here liability [was] clear," the injuries were fatal, and "a judgment in excess of the policy limits" was not only "likely" but virtually inevitable. *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. 3d DCA 1991). Indeed, it is undisputed that GEICO made the one and only settlement offer in this case. That alone should decide this particular case as a matter of law. *See Novoa v. GEICO Indem. Co.*, 542 F. App'x 794, 796 (11th Cir. 2013) ("[W]e find it hard to imagine how [the insurer] acted in bad faith when it offered to pay everything it possibly could under the policy.").

Rather than take issue with the Fourth District's analysis of the specific *Boston Old Colony* obligations, the majority points to the Fourth District's purported failure to focus on the more general language in *Boston Old Colony* regarding an insurer's duty to use "the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *E.g.*, majority op. at 18 (quoting *Boston Old Colony*, 386 So. 2d at 785). In doing so, the majority completely divorces that general language from the specifically enumerated obligations and effectively adopts a negligence standard

for bad faith actions, even though negligent claims handling does not amount to bad faith failure to settle. *See Campbell*, 306 So. 2d at 530 (noting that the "standard[] for determining liability in an excess judgment case is bad faith rather than negligence"); *see also Auto Mut. Indem. Co. v. Shaw*, 184 So. 852, 858 (Fla. 1938) (noting that bad faith involves "a heavier burden upon the insured" than does negligence). Indeed, under the majority's misreading of *Boston Old Colony*, the jury in that case should have been permitted to decide whether "a person of ordinary care and prudence" would have similarly refused the offer from the injured third party to settle for the insured's meager $10,000 policy limits. But this Court decided *Boston Old Colony* as a matter of law because the insurance company fulfilled its specific obligations and stood ready and willing to settle, notwithstanding that a settlement was never consummated. The point is, there must be a *bad faith* failure to settle within the policy limits, not just a "dropp[ing of] the ball," majority op. at 14, at some point during the claims process.

The majority compounds its misreading of *Boston Old Colony* by misreading and unduly emphasizing the following language from *Berges*: "the focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." *E.g.*, majority op. at 19 (quoting *Berges*, 896 So. 2d at 677). The majority interprets this language as standing for the unsupportable proposition that the actions of the insured and the

third-party claimant are irrelevant in any suit for bad faith failure to settle. But *Berges* cited *Boston Old Colony* as support for that "focus" language. *Berges*, 896 So. 2d at 677. And *Boston Old Colony* clearly considered the insured's own actions, as well as those of the third-party claimant. *Boston Old Colony*, 386 So. 2d at 785-86. Indeed, the specific obligations enumerated in *Boston Old Colony* themselves contemplate the relevance of the insured's actions. *Id.* at 785 (explaining that the insurer has a duty "to warn of the possibility of an excess judgment, and to *advise the insured of any steps he might take* to avoid same" (emphasis added)). Neither *Boston Old Colony* nor *Berges* require (or permit) ignoring the actions of Harvey and the estate.

As it relates to Harvey, the uncontroverted evidence shows that: (1) Harvey and his attorney knew that the estate was requesting certain information from Harvey even after the policy limits were tendered; (2) Harvey provided the necessary information to his attorney *three weeks* before suit was filed; and (3) at no time—before or after suit was filed—did Harvey or his attorney offer to provide the information. Indeed, "neither [Harvey] nor his attorney took any further action to provide the estate with a statement." *Harvey*, 208 So. 3d at 813. The majority's inattention to these salient facts is wholly unwarranted.

The estate's conduct is also relevant to explaining why GEICO should prevail as a matter of law. For example, just as the third-party claimant did in

- 41 -

*Boston Old Colony*, the estate here "refused to settle" for the offered policy limits. *See Boston Old Colony*, 386 So. 2d at 786. Moreover, unlike the third-party claimant in *Berges*, the estate here never once presented "a valid opportunity to settle." *Berges*, 896 So. 2d at 675. Despite testifying nine years after the fact that he would have recommended settlement if Harvey had disclosed his asset information, the estate's attorney never once demanded the information, imposed any deadline, or presented any conditions under which a settlement would be effectuated within the policy limits. In other words, the estate never indicated it would accept the policy limits and forego pursuing a judgment if Harvey's immediately "collectible" assets were less than $100,000. In the end, GEICO presented the one and only settlement opportunity in this case.

Turning a blind eye to the wildly speculative nature of this bad faith claim, the majority not only ignores the conduct of Harvey and the estate but also relies on unsupported assumptions. For example, the majority notes that statement requests from plaintiffs' attorneys are "standard practice." Majority op. at 15. From there, the majority comfortably assumes that insureds routinely agree to such requests. *See* majority op. at 16 (noting that GEICO should "have done everything possible to comply with the estate's reasonable demands"). But there is nothing in the record indicating that insureds—let alone insureds who cause catastrophic damages far exceeding their policy limits and whose assets far exceed those same

policy limits—routinely provide their financial information to and sit for recorded interviews conducted by plaintiffs' attorneys. Indeed, Harvey's own actions expose the unreasonableness of the majority's assumption.

By adopting a negligence standard in all but name, ignoring the controlling conduct of the insured and the third-party claimant, and relying on unsupported assumptions, the majority incentivizes a rush to the courthouse steps by third-party claimants whenever they see what they think is an opportunity to convert an insured's inadequate policy limits into a limitless policy. But under a proper reading of our bad faith jurisprudence, GEICO is entitled to judgment as a matter of law. Any shortcoming on the part of GEICO in this case amounts to negligent claims handling, at most. GEICO promptly tendered the policy limits, the estate never made any demand—time-limited or otherwise—or presented any concrete conditions under which it would agree to settle for the policy limits, and Harvey never once offered to provide the supposedly critical personal information despite having that information available and knowing that it had been requested.

### III. Conclusion

The majority's determination of jurisdiction rests on the majority's own misreading of our case law. Because this Court lacks jurisdiction, I would discharge this case. The Fourth District correctly decided to reverse the trial court's denial of GEICO's motion for directed verdict. Viewing the facts in the

light most favorable to the insured, no reasonable jury could reach a verdict of bad faith failure to settle within policy limits in this case. Finding bad faith in the circumstances presented here works a vast and unwarranted expansion of liability for bad faith claims. In Florida law, mere negligence has now become bad faith. I strongly dissent from this unjustified change in the law.

POLSTON and LAWSON, JJ., concur.

POLSTON, J., dissenting.

Because the Fourth District's decision in *Geico General Insurance Co. v. Harvey*, 208 So. 3d 810 (Fla. 4th DCA 2017), does not expressly and directly conflict with this Court's decisions in *Boston Old Colony Insurance Co. v. Gutierrez*, 386 So. 2d 783 (Fla. 1980), and *Berges v. Infinity Insurance Co.*, 896 So. 2d 665 (Fla. 2004), this Court does not have the constitutional authority to review this case. Therefore, I respectfully dissent.

In *Boston Old Colony*, 386 So. 2d at 784, this Court answered a certified question regarding whether our case law "authorize[d] a bad faith action against an insurance company when that company has refused to settle a claim at the express direction of its own insured who obtain[ed] a settlement of his claim and the insurance company thereafter offer[ed] to settle for its policy limits before trial." "Although we [held that our precedent] may, in some circumstances, authorize such a suit, we [found] the evidence in [*Boston Old Colony*] legally insufficient to

show bad faith  . . . ." *Id.*  Boston Old Colony had argued "that its motion for a directed verdict should have been granted" given the lack of evidence of bad faith. *Id. at 785.*

In reaching our decision in *Boston Old Colony*, this Court set forth the obligations of good faith that an insurer owes to its insured:

> An insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business.  For when the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, then the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured.  This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same.  The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospects of paying the total recovery, would do so.

386 So. 2d at 785 (citations omitted).  This Court stated that the evidence demonstrated that Boston Old Colony had fulfilled these enumerated obligations; therefore, there was "no sufficient evidence" of bad faith, and Boston Old Colony's motion for directed verdict should have been granted.  *Id.* at 785-86.

The Fourth District conducted nearly an identical analysis in *Harvey*.  First, it quoted the above, block-quoted language from this Court's decision in *Boston*

- 45 -

*Old Colony*.  Then, the Fourth District explained how the evidence demonstrated

that GEICO had fulfilled the obligations of good faith listed in *Boston Old Colony*:

> (1) GEICO was obligated to "advise the insured of settlement opportunities."  Although GEICO did not immediately inform the insured that the estate wanted a statement, the evidence showed that GEICO notified the insured on August 31 that the estate wanted the insured's statement.  Significantly, the estate did not inform GEICO that a full settlement of its claim against the insured was contingent upon providing a statement.  Thus, GEICO fulfilled this obligation.
> (2) GEICO was required to "advise as to the probable outcome of the litigation," and (3) "warn of the possibility of an excess judgment."  Here, the record reflects that GEICO promptly warned the insured as to the possibility of an excess judgment.  Thus, GEICO satisfied these obligations as well.
> (4) GEICO was also obligated to "advise the insured of any steps he might take to avoid" an excess judgment.  The record also shows that GEICO did this too, and recommended that the insured retain his own attorney, which he did, and, as stated above, informed the insured that the estate wanted a statement.
> (5) GEICO was further obligated to "investigate the facts."  Nothing in the record indicates GEICO was deficient in this regard.
> (6) GEICO could not have given "fair consideration to a settlement offer" because the evidence was undisputed that the estate never made a settlement offer.
> (7) Finally, GEICO was required to "settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so."  Here, GEICO attempted to settle with the estate nine days after the accident by tendering, without limitation or even a demand, the full policy limits to the estate's attorney.  Thus, the evidence showed that GEICO also fulfilled this final obligation.

*Id.* at 815.  Accordingly, just as this Court in *Boston Old Colony* held after

concluding that the evidence demonstrated that the insurer fulfilled its obligations

of good faith, the Fourth District "conclude[d] that the trial court should have

- 46 -

directed a verdict" in the insurer's favor. *Id.* at 816. There is no conflict (misapplication or otherwise) between *Boston Old Colony* and *Harvey*.

Additionally, there is no conflict between the Fourth District's decision in *Harvey* and this Court's decision in *Berges v. Infinity Insurance Co.*, 896 So. 2d 665 (Fla. 2004). In *Berges*, 896 So. 2d at 668-69, this Court repeated the obligations outlined in *Boston Old Colony,* the same obligations of good faith applied by the Fourth District in *Harvey*. The results were different in *Berges* and *Harvey* because the facts were different. In *Berges*, 896 So. 2d at 670-71, the insurer failed to meet settlement deadlines and only notified the insured of the possibility of an excess judgment and the right to retain independent counsel after the deadlines passed. There was also expert testimony in *Berges* that the insurer "could have and should have been able to pay the policy limits within the time period." *Id.* at 678. In contrast, in *Harvey*, GEICO did not fail to meet any settlement deadlines, and GEICO promptly notified the insured of the possibility of an excess judgment and the right to retain independent counsel 3 days after the accident. 208 So. 3d at 812. And 9 days after the accident, "GEICO sent the estate a release along with a check for the $100,000 policy limits even though the estate never demanded the policy limits." *Id.* Furthermore, in *Harvey*, the Fourth District's examination of GEICO's conduct in fulfilling its obligations of good faith is entirely consistent with the language in *Berges* stating that the focus of a

bad faith case is on the conduct of the insurer. The Fourth District's comment in *Harvey* regarding the insured's actions or inactions was dicta and only mentioned after Fourth District reached its holding that GEICO fulfilled its obligations of good faith to the insured. Therefore, because *Harvey* applied the same obligations of good faith listed in *Berges* to reach its holding but to different facts, there is no conflict.

Accordingly, *Harvey* does not conflict with *Boston Old Colony* or *Berges*, and this Court does not have jurisdiction. I respectfully dissent.

CANADY, C.J., and LAWSON, J., concur.

Application for Review of the Decision of the District Court of Appeal – Direct Conflict of Decisions

Fourth District - Case No. 4D15-4724

(Palm Beach County)

Kimberly L. Boldt of Boldt Law Firm, P.A., Boca Raton, Florida; Fred Cunningham and Sean Domnick of Domnick Cunningham & Whalen, P.A., Palm Beach Gardens, Florida; and Philip M. Burlington, Bard D. Rockenbach, and Andrew A. Harris of Burlington & Rockenbach, P.A., West Palm Beach, Florida,

for Petitioner

B. Richard Young, Adam A. Duke, and Cody S. Pflueger of Young, Bill, Boles, Palmer & Duke, P.A., Miami, Florida,

for Respondent

Louis K. Rosenbloum of Louis K. Rosenbloum, P.A., Pensacola, Florida,

for Amicus Curiae Florida Justice Association

Stephen A. Marino, Jr., Benjamin C. Hassebrock, and Michal Meiler of Ver Ploeg & Lumpkin, P.A., Miami, Florida; and Mark A. Boyle, Molly Chafe Brockmeyer, and Meagan R. Cyrus of Boyle & Leonard, P.A., Fort Myers, Florida,

 for Amicus Curiae United Policyholders

Rodolfo Sorondo, Jr., of Holland & Knight LLP, Miami, Florida; and William W. Large of Florida Justice Reform Institute, Tallahassee, Florida,

 for Amicus Curiae Florida Justice Reform Institute

Christine Davis Graves and Sylvia H. Walbolt of Carlton Fields, Tallahassee, Florida,

 for Amici Curiae American Insurance Association, National Association of Mutual Insurance Companies, Personal Insurance Federation of Florida, and Property Casualty Insurers Association of America